# JACOB M. DOUGLASS

*v.*

# DAVID T. LITTLER *et al.*

1. FRAUD—*false representations—matters of opinion.* Ordinarily, matters of opinion between parties dealing upon equal terms, though falsely stated, are not relieved against in equity.

2. In order to entitle a party to relief for any misrepresentation, it must appear that he relied upon it.

3. Upon bill filed to set aside a deed executed by the complainant to the defendant, upon the alleged ground of fraud and misrepresentation in its procurement, it appeared the defendant, having purchased a tax title to the land, applied to the complainant, who owned the original patent title, for a quit claim deed, representing to the complainant that his tax title was good, and the complainant's title worthless. The evidence showed that the defendant at the time believed these representations to be true. It resulted, however, that the tax title was in fact utterly worthless: *Held,* the representation by the defendant as to the validity of his tax title, was to be regarded as a mere expression of opinion, and as the parties dealt upon equal terms, there being no special confidence or relation existing between them, the defendant was not guilty of a fraud for which the deed could be avoided, merely because of the expression of such opinion, which the facts did not justify, so long as he made no false statement as to what those facts were.

4. Moreover, it appeared the complainant had abandoned his land long previous to the application of the defendant for a deed, upon information obtained from other sources that it had been sold for taxes, and that his title was gone, so that he could not be regarded as having relied upon the representations of the defendant, but rather upon a pre-existing belief that he had lost his title by means of the tax sales; and, not relying upon the representations of the defendant, he could not be considered as having been defrauded by them.

5. CONVEYING AN INTEREST—*not known to exist.* A party can hardly be said to part with a right, or title, of the existence of which he is wholly ignorant; and if he does not so intend, a court of equity will, in ordinary cases, relieve him from the legal effect of instruments which surrender such unsuspected right or title.

6. But this principle has no application to a case where the owner of a paramount title to land, fully aware of the existence of his own title, surrenders it to the owner of an adverse tax title upon a misconception as to the strength of the tax title.

7. INADEQUACY OF CONSIDERATION—*voluntary conveyance, as between the parties.* Mere inadequacy of consideration, in the absence of fraud, will not be sufficient to enable a grantor to avoid his deed made in submission to an adverse claim of a tax title, without first making an investigation as to whether it was well founded or not, although the tax title may really have been of no validity. Equity will not relieve a party against such negligence and folly.

WRIT OF ERROR to the Circuit Court of Logan county; the Hon. JOHN M. SCOTT, Judge, presiding.

Mr. WILLIAM B. JONES, for the plaintiff in error.

Messrs. WILLIAMS & BURR, and Mr. MILTON HAY, for the defendants in error.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was a bill in chancery, brought by Jacob M. Douglass against David T. Littler, in the Logan circuit court, on the 6th day of January, 1868, to set aside a deed of three half sections of land, executed by Douglass to Littler on the 16th day of July, 1864, on the ground of fraud on the part of Littler in the procurement of said deed.

The bill alleges that Douglass owned the land in fee simple; that Littler, for the purpose of defrauding Douglass, first wrote him a letter dated July 1, 1864, in which he falsely represented that he was interested in the land; and another, dated July 13, 1864, in which he falsely represented that he owned the land which Douglass formerly owned, and asked Douglass to give him (Littler) a deed, proposing to pay him for the trouble of executing the deed, saying to Douglass it could do him no harm to part with that which was of no value or advantage to him.

It is further charged, that R. B. Latham had upon the land an invalid and worthless tax title; that Latham, on the 14th of July, 1864, conveyed to Littler, by quit claim, the S. hf. of sec. 20, the N. W. qr. of sec. 29, and the S. W. qr. of sec. 28; and that, on the 16th of July, Littler visited Douglass at the residence of the latter, in Burlington, New Jersey, and falsely

and fraudulently represented to Douglass, substantially, that he (Littler) had purchased all of said lands at tax sale; that he had fully investigated the title, and that Douglass had wholly lost his title; that it was worthless, and Littler's title was good, and that Littler cared nothing about the Douglass title, except that it might avoid trouble some day to Littler's children.

Further, that Douglass was in a delusion about his title; that Littler knew that fact, and knew Douglass' title was good, and that the tax title was worthless; that Littler encouraged such delusion, and withheld from Douglass information which he ought to have imparted.

That Douglass, confiding in the truth of the statements of Littler, executed said conveyance for no consideration. Littler proposed to pay Douglass for the trouble of executing the deed, which Douglass refused, and Littler then handed him $25 as a present to Douglass' wife.

The answer of Littler to the original bill, neither admits nor denies that Douglass ever had a good title to the lands; denies that he had such title on the 16th of July, 1864, denies expressly the fraud as charged, admits the writing of the letters to Douglass, of the 1st and 13th of July, and says any statement in said letters to the effect that Douglass' title was worthless, "was merely an expression of opinion, and was then, and still is, fully entertained." That he visited Douglass at his residence, exhibited his deeds, and desired to purchase the lands; that Douglass told him he had abandoned the lands, having lost his title by failure to pay the taxes, and willingly and promptly executed the conveyance desired; that Douglass claimed to have, and to act on full knowledge and information; that Littler only desired a conveyance for those lands previously conveyed to him by Latham, but Douglass had so utterly abandoned the lands, that he directed the entire three half sections to be conveyed.

The answer further sets up, and relies on claim and color of title in Latham, by virtue of the tax deeds, and payment of

taxes thereunder, and asks the protection of the statute of limitation of 1839. It does not rely on lapse of time, or limitation, aside from said statute, but alleges Littler has expended many thousands of dollars improving the lands. It avers that he has conveyed to S. C. Parks the S. W. qr. of sec. 28, and to Levi Baxter the N.W. qr. of same section, and mortgaged to W. A. Turney the S. hf. of sec. 20, and N. hf. of sec. 29.

The circuit court dismissed the bill, and the complainant brings the record here and assigns the dismissing of the bill as error.

The lands in controversy were entered in the name of the plaintiff, Jacob M. Douglass, and purchased by him from the United States in 1835.

R. B. Latham held two tax deeds of them, under tax sales made in 1851 and 1858. He paid the taxes assessed on the two half sections in 20 and 29, for the years 1858, 1859, 1860, 1861, 1862, 1863 and 1864; the taxes for 1864 were paid April 23d, 1865.

It appears from the testimony of Littler and Latham, that in the spring of 1864 Mr. Littler was a young man, residing in Lincoln, Ill. He had been admitted to practice law for some three years, but had little practice in the circuit court, and was a justice of the peace. He had never had anything to do with tax titles. Mr. Latham, who was an intimate friend, proposed to sell to him, for $3,000, the S. hf. of sec. 20, the N. W. qr. of sec. 29, and the S. W. qr. of sec. 28, in town 20, N. R. 4 W., a part of the lands in controversy. Latham's title was founded on tax sales, but he told Littler he had taken a great deal of pains in having the sales made, and that his title was good. Littler, without making any examination as to the tax title, closed the bargain with Latham for the lands. About the 1st day of May, 1864, he paid $500 down, conveyed to Latham a lot of land on the public square in Lincoln for $500, now worth $3,000 or $4,000, and gave his notes for $2,000, all of which have since been paid; but the deed was not executed until July 14th, 1864, it being a quit claim deed. After closing the trade with Latham, but before obtaining his

deed, Littler wrote to the complainant, stating that he (Littler) was interested in the land, and asking if Douglass was the person who formerly owned the same. Douglass answered, stating in substance that he was. At this time Littler intended to try to get a quit claim deed from Douglass by correspondence. He was then informed that S. P. Hodgen had started, or was about to start, to see Douglass to buy the land. He consulted with Mr. Latham, and was advised by the latter to go and see Douglass, and try to get a quit claim deed if it could be got for $500. Littler did not think a quit claim deed from Douglass worth that sum, but Latham told him it would be worth that much if he ever wanted to sell. Acting upon this advice, Littler visited New Jersey and obtained his quit claim deed, and paid to Douglass $25 to hand to his wife, Douglass declining to receive anything himself. Littler testifies that Douglass voluntarily included in the deed the N. W. qr. of sec. 28, and the N. E. qr. of sec. 29, which he (Littler) did not claim, but which one Baxter had bought of Latham.

After returning to Illinois, Littler offered to quit claim the last mentioned two quarter sections to Baxter for $100, which Baxter refused to give, thinking his own tax title was good. Littler swears he never doubted the validity of Baxter's title, it depending on the same tax sales as his own, till Baxter refused to contribute the $100, when Littler's attorney, Mr. Greene, of his own motion, examined the records of the tax sales, and pronounced the sales invalid.

The statements of Littler, by which Douglass claims to have been defrauded, consisted of assurances, more or less confidently made, that the title of Douglass had failed by reason of tax sales, and that the title of Littler, derived from such sales, had become perfect.

As to the good faith of Littler in making such statements, we have not only Littler's sworn statement that he believed the tax title to be good, and Latham's assurance to him that it was so, but the fact that he invested his all in it by paying, and promising to pay for it, more than twice as much as he

was worth, and the further fact that for $100 he offered to quit claim to Baxter, the title which he had obtained from Douglass to 320 acres of the land which Baxter had bought of Latham, under the same tax title, indicate very strongly Littler's faith in the tax title, and the small account in which he held the title acquired from Douglass.

We think the proof fails to show, that Littler, knowingly, made any misrepresentations as to the title, and that it does show he believed the representations he made, as to Douglass' title, to be true.

It is insisted, however, that although the proof fails to establish actual fraud, and Littler may have honestly entertained the opinions expressed to Douglass, the latter was, nevertheless, deceived and defrauded by them.

As to what the representations were, Littler, in his letter of July 13th, to Douglass, says: "I am the owner of the lands you formerly owned, and would like to have you give me a quit claim deed. It can do you no harm to part with that which is of no advantage or value to you." It does not appear that letter had been received previously to the making of the deed of July 16th; we think it had not. Douglass swears that Littler spoke positively on the question of title, claimed to have examined the same, and that his title had become perfect, and that of Douglass had wholly failed. Littler swears he did nothing more than express a belief in the goodness of his own title, without stating he had examined the same.

The only real difference as to what transpired between Littler and Douglass, relates to the degree of confidence with which Littler spoke concerning the title. What he said as to that, was but a matter of opinion. Douglass admits Littler told him his title was founded on a tax sale. Littler did not represent himself as a lawyer, or that he had taken any professional opinion on the state of the title. He truly disclosed the origin of his own title, and gave Douglass all the information that could be needed for tracing up the same. The

source of information to ascertain the facts, upon which the validity of the tax title depended, was the records of the county clerk's office of the county in which the lands lay, and they were open to all persons for information, equally as accessible to Douglass as to Littler, save that Douglass resided at a greater distance away.

There was no necessity of making the deed at once, and by taking a little time for examination and inquiry, the defects in the tax title might have been discovered before the making of the deed. Littler made no misstatement of any matter of fact; he said his tax title was good, but made no statement of any matter going to show the title was valid. Whether it was good or not, was a question of law, for the decision of which, Douglass, so far as then appeared, was as competent as Littler; and the facts upon which an opinion might be based, were placed within his reach by Littler, by his disclosing the proper source of information. The parties dealt upon equal terms; there was no special confidence or relation existing between them, and Littler was not guilty of a fraud for which this deed can be avoided, merely because he expressed an opinion as to the validity of his tax title, which the facts did not justify, so long as he made no false statement as to what those facts were.

Ordinarily, matters of opinion between parties dealing upon equal terms, though falsely stated, are not relieved against. *Drake* v. *Latham*, 50 Ill. 270; 1 Story Eq. Ju. § 197; *Stover* v. *Mitchell*, 45 Ill. 213.

Again, to entitle the plaintiff to relief for any misrepresentation, he must have relied upon it. Did Douglass rely upon any assurance of Littler, as to the condition of the title? It is almost inconceivable that Douglass would make a conveyance of valuable land to an entire stranger, merely because the latter claimed to own the same land already. The explanation of such conduct is furnished by the following letter from

Douglass to Littler, dated July 8, 1864, in reply to Littler's letter of inquiry of July 1, 1864:

" BURLINGTON, July 8, 1864.

DAVID T. LITTLER, Esq.:

*Dear Sir* :—Yours of July 1st was received July 7th. In reply to your questions, first, I purchased of Samuel G. Wright, about 20 years past, a section of land in Illinois, in Sangamon county, near Springfield; the tax was paid for years by Mr. S. G. Wright. He having deceased, and having my papers in his possession, I sent out by one of my friends to pay the tax, I think, two years ago. When my friend returned, he informed me my land was sold for the said taxes. After making inquiry what I should do, I was informed it would be more trouble and expense than it was all worth, so ended my Illinois fortune.

I am with much respect, yours,<br>
J. M. DOUGLASS."

Mr. Littler swears, Douglass told him he had paid no attention to the land for more than twenty years, except in sending an agent out to look after it for him.

The inducement to the making of the deed in question, was a conviction in the mind of Douglass that the title to his lands had become worthless through a sale of them for taxes, and this letter affords conclusive proof that such conviction existed long before he ever heard of Littler, and had been acted upon by an entire abandonment of the lands, as not worth caring for. Douglass had received, long previously, information of the sale of his lands for táxes; he then set on foot his own inquiry as to what he should do, and the result of it was, that it would be more trouble and expense to recover the lands than they were worth. This was a satisfactory ground for him upon which to act; he let the lands go, and cared no further for them. How, then, can it be said Littler's expression of opinion, that his tax title was good, produced in the mind of Douglass the belief of the worthlessness of his title?

The unhesitating readiness, too, with which Douglass executed the deed, evinces that such belief was a pre-existing one. He asked nothing for his lands, he cared nothing for them, and made the deed for the asking. He really learned nothing additional from Littler, except that the latter was the owner of the tax title. That his lands were lost to him, by means of a sale for taxes, he had already assured himself of. If Douglass did not, in fact, rely upon any statement of Littler, he could not have been defrauded thereby.

But it is said, if the parties were in a mutual error, supposing Douglass had no real interest in the lands, and that the deed was only removing a cloud upon Littler's title, if it did pass a valuable estate, it was something neither party intended, and the deed should be set aside.

A party can hardly be said to intend to part with a right, or title, of whose existence he is wholly ignorant; and if he does not so intend, a court of equity will, in ordinary cases, relieve him from the legal effect of instruments, which surrender such unsuspected right or title. 1 Story Eq. Ju. § 122. But we do not consider this case comes within range of that principle.

Here, Douglass was aware of the existence of his own title, and knew of the adverse tax title; the misconception was as to the strength of the tax title. Douglass saw fit to yield to it as the paramount title, without any investigation as to its validity, which the most ordinary precaution would have required of him to make before making the deed; or, as seems likely, he had no care for its validity, and made the deed in consequence of a predetermined choice to abandon the land, after a balancing of the profit and loss of retaining it, or letting it go.

It is insisted there was such inadequacy of price, as to demonstrate some gross imposition or some undue influence. The lands appear to have been worth about $10 per acre at the date of the deed, and Hodgen testifies he visited Douglass to buy the lands, but did not arrive until after Littler had procured the deed, and that he would have paid Douglass $8 or $10 per acre for them, and risked any tax titles on them;

he, however, valued the lands at $15 per acre, much higher than the other witnesses.

But here the grantor, in making the conveyance, intended the consideration therefor to be nominal. We find he did not make the deed by reason of any fraud perpetrated upon him, and equity will not enable him to retake that which he has conveyed voluntarily, without being in any way defrauded.

The assertions of Littler in regard to title, were but matters of opinion, upon which Douglass had no right to rely ; and if he did rely upon them, it was his own indiscretion. It may have been unwise in Douglass, a long time ago, to have given over this land as not worth reclaiming from its sale for taxes, but it was his own act. To make a release of his right, in submission to an adverse claim of a tax title, without first making any investigation as to whether the latter was well founded or not, was very great negligence ; and whatever the plaintiff has suffered, has arisen from culpable inattention to his own interests.

We view this as an application by the complainant to be relieved against the consequences of his own gross negligence, indiscretion and folly.

Chancellor Kent, speaking upon this subject in his Commentaries, says :

"The common law affords, to every one, reasonable protection against fraud in dealing, but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information." Vol. 2, 646, 11th Ed.

And it is the settled doctrine that the effects of such conduct are not relievable against in equity. 1 Story Eq. Ju. § 105, § 200 a.

The decree of the court below, dismissing the bill, is affirmed.

*Decree affirmed.*

Mr. Justice Scott took no part in this decision.