IVY OWENS MORGAN

*v.*

WILLIAM L. H. OWENS.

*Opinion filed October 23, 1907.*

1. DEEDS—*when a deed from father to daughter should be set aside.* A quit-claim deed signed by an aged and infirm man at the instance of his son, in whom the grantor reposed confidence but who failed to disclose the fact that the deed, which was to the grantor's daughter, conveyed a valuable interest of the grantor in the property which had belonged to a deceased daughter, is properly set aside, where it appears the grantor, by reason of his confidence in his son, failed to read the deed and believed he was merely conveying his dower interest in property of his deceased wife, from whom he had been divorced for many years.

2. SAME—*party in whom confidence is reposed must show fairness of transaction.* In a proceeding to set aside a deed between a parent and child, if circumstances are proven which establish a fiduciary relation between the parties, the party in whom the other has reposed confidence must show, in order to sustain the deed, that the transaction was fair and free from undue influence.

3. EQUITY—*equity has power to rescind contract for mistake of fact.* A court of equity has power to rescind or cancel a contract at the instance of one party thereto, who has, without negligence, entered into the contract through a mistake of fact material thereto, if such course can be pursued without injustice to the other.

APPEAL from the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

GEORGE N. MORGAN, (LLOYD G. KIRKLAND, and JOHN S. HUEY, of counsel,) for appellant.

FOLLANSBEE, McCONNELL & FOLLANSBEE, (HENRY M. JOHNSON, and RALPH D. STEVENSON, of counsel,) for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

The circuit court of Cook county on March 9, 1907, entered a decree setting aside a quit-claim deed executed by appellee, whereby he conveyed to his daughter, appellant, his interest in a house and lot in Chicago, on the ground of mistake, incapacity and misrepresentation. From this decree appeal is taken to this court.

Appellee, William L. H. Owens, was married to Frances Johnson Owens in 1864, and there were born of the marriage five children,—May, Amy, Guy, Roy and Ivy, the latter being appellant herein. Appellee was a proof-reader and printer. In 1888 his wife secured a divorce from him, and about that time he went to Louisville, Kentucky, where he still resided at the time of the hearing in this case. Except during a few years, when Roy and Ivy resided with their father at Louisville, all the children made their home with their mother, in Chicago. The evidence clearly shows that his affection for his children still remained, to a considerable degree. In 1881 appellee suffered a sunstroke, and later on was in a building which was blown down by a destructive tornado in Louisville. His health for some years before the giving of the deed here in question had been very poor,—evidently bordering on nervous prostration or like trouble. He was then unable to work without lying down at intervals and was subject to insomnia and vertigo. He secured a modest living of from $25 to $30 a month by running a small printing shop having equipment worth about $300, with the assistance of one helper. On December 30, 1903, Mrs. Owens, appellee's former wife,

and his daughter Amy Owens, met their death in the Iroquois Theater fire, in Chicago. At the time of her decease Amy Owens was the owner in fee simple of a house and lot on Kimbark avenue, in Chicago, valued at about $8000, subject to a mortgage of $3000. She was unmarried, left no children or descendants of children and died intestate. Said premises became, by descent, the property of the children, May, Guy, Roy and Ivy, and of appellee. Appellee came to Chicago and attended the funeral. On January 8, 1904, appellee's son Roy Owens went to Louisville, taking with him a quit-claim deed of the Kimbark avenue property to Ivy Owens, as grantee, and also a power of attorney to Ivy Owens authorizing her to convey, release and quit-claim all appellee's interest in the estate of his daughter Amy. After an affectionate greeting they went together to the office of an attorney, who testified, however, that in this matter he considered that they wished him to act simply as a notary public. Appellee, after very hurriedly glancing over the papers, signed and acknowledged them, and afterwards he or the notary delivered them to the son. Roy and May had apparently signed the deed in Chicago before it was presented to the appellee. As to just what appellee understood he was signing away and what Roy stated to him the papers contained the testimony is somewhat in conflict. Appellee testified that when his son first met him he stated, "Pa, we are going to give you your share of Amy's property," and that he replied, "All right; I don't care so much for the property as I do for your love;" that the son said, "Now, there will be some probate business, and as Ivy will be in Chicago and I will be away, and May will be in California and Guy is in Honolulu, we have concluded to sign a paper having Ivy represent us," whereupon appellee said, "All right." Appellee further testified that he thought he had little or no interest in the Kimbark avenue property, as he understood it belonged to his former wife, and that being a divorced man the only necessity of his signing the

deed was to clear the record of any former dower estate
he may have had; that he did not know his daughter Amy
was the owner of the premises or that he was signing away
his rights derived by descent from her, and did not learn
of that until some time in December, 1905. The attorney
before whom, as a notary public, the quit-claim deed was
acknowledged, testified that the two came to his office and
Roy took the papers from his pocket; that witness asked
appellee if he had read the papers, and he replied: "No; I
haven't read them; Roy told me what was in them; that
is all right; take the acknowledgment according to law,"
and that he then sat down and signed the papers; that
after this was done and his certificate added, witness deliv-
ered them to Roy Owens, and that appellee did not read
them while in his office. On behalf of the appellant, Roy
Owens testified that he told his father he had come down
with some papers for him to sign, so it would facilitate
settling up Amy's estate; that on the way to the attorney's
office he explained to his father that they did not want to
beat him out of anything that was rightfully his, and three
or four times during that conversation his father said, "I
don't want a thing; all I want is your love;" that at about
the instant his father commenced to sign the papers the
attorney said, "Mr. Owens, you know what your are sign-
ing?—You are signing away your title to your daughter's
property;" that the father said, "Yes, I know what I am
doing; I want nothing." The son testified that an hour or
so after the papers were signed he gave his father $25,
which witness considered as a consideration and not as a
gift, but he also admitted that nothing at all was said to
appellee, before he signed the papers, about paying him for
signing them. It seems to be assumed in the briefs that
appellee's interest in the premises was worth not far from
$2000. The attorney who took the acknowledgment of the
deed was asked as to Roy Owen's version of what took
place just at the time of signing, and stated that no men-

tion whatever was made of the property belonging to Amy Owens; that her name was not mentioned, and that he (witness) did not know anything about the fact that the property belonged to her. It appears from the testimony on behalf of appellee that he first learned that his daughter Amy, and not his former wife, died seized of the premises in question, in December, 1905, when his attorney, at his request, wrote to Ivy to see when she was going to submit her account of the settlement of the estate under the power of attorney. The daughter mentioned in her reply that the house had belonged to Amy. The attorney stated that when he reported this to Mr. Owens he seemed very much surprised to learn it. The attorney also testified that the letter was the first information he himself had of Amy's ownership of the house.

The weight of the evidence sustains the findings of the master and the decree of the chancellor that appellee did not understand, when he signed the quit-claim deed in question, that the title to the property was in the name of his deceased daughter at the time of her death. There is nothing in the deed to indicate through whom the grantors were supposed to derive title. At the time he signed this deed his son Roy told him that it was done to facilitate the closing up of the estate of appellee's daughter. We think the conclusion in the decree that in signing said quit-claim deed appellee believed that the property in question had belonged to his divorced wife and that he was signing it for the purpose of releasing any curtesy or dower interest he might have therein is supported by the evidence. The transaction should not be considered the same as if it had been between the father and an entire stranger. The two daughters and the son in Chicago had a conference and prepared these papers, and the son took the necessary time and was at considerable expense in going in person to his father in Kentucky to get him to sign them. It is true he did not, in terms, tell his father that the property did not stand in

the deceased daughter's name.  We think, however, that in view of the surrounding facts and circumstances the son was in duty bound to tell his father frankly the entire situation as to the title and what they intended to do; that he should have told him more than that they simply wanted to have these papers signed for the purpose of facilitating the closing of the estate.  The father reposed such trust and confidence in the son that under the law fiduciary relations must be presumed to have existed between them, and this being so, he was bound to show absolute good faith on his part.  (*Leonard* v. *Burtle,* 226 Ill. 422; *Weston* v. *Teufel,* 213 id. 291.)  Transactions between parties situated as the father and son were at this time are *prima facie* voidable upon motion of the one reposing the confidence, upon grounds of public policy, and the burden of proof, such fiduciary relations having been established, is upon the one seeking a benefit to show the absence of undue influence. (*Thomas* v. *Whitney,* 186 Ill. 225; *McParland* v. *Larkin,* 155 id. 84.)  Obviously, from this record, appellee made a mistake of fact as to what interest he had in the property that he was quit-claiming.  A court of equity has the power to rescind or cancel an agreement at the request of one party upon the ground that without negligence he entered into it through a mistake of facts material to the contract, when it can do so without injustice to the other party.  In cases of unilateral mistake the remedy is rescission of the contract.  (1 Beach on Modern Eq. Jur. sec. 51.)  A mistake on one side may be ground for rescinding but not for correcting or rectifying an agreement.  (*Sutherland* v. *Sutherland,* 69 Ill. 481; Kerr on Fraud and Mistake,—Bump's ed.—422; *Hoops* v. *Fitzgerald,* 204 Ill. 325.)  Where one party has entered into a contract through a mistake as to one of the essential facts, it will constitute a ground for rescinding or canceling the contract, since the minds of the parties have failed to meet upon the same matters and no agreement was really made.  (2 Pomeroy's Eq. Jur.—

3d ed.—sec. 870; 1 Story's Eq. Jur.—12th ed.—p. 135, and note 3; 24 Am. & Eng. Ency. of Law,—2d ed.—p. 618, and cases there cited.) If the mistake is not in the expression of the agreement but in some fact materially inducing it, the mere knowledge by one party of a mistake in the other party does not, in the absence of a duty to disclose it, constitute sufficient grounds, in equity, to have the agreement canceled. If the parties are at arm's length either may remain silent. The case, however, is otherwise if there be a duty to disclose and the party who is under such duty does not disclose; he will then not be permitted by a court of equity to hold the other party to his agreement. (Kerr on Fraud and Mistake,—Bump's ed.—pp. 414, 415.) Appellee, at the time he signed this deed, was in very poor health, and had no property except a small printing establishment, by which he was able to earn from $25 to $30 a month, which constituted his entire means of support. He was past sixty-six years of age, and evidently worrying over how he was to obtain a living in the coming years. These facts, taken in connection with the relations that existed between the father and son, placed the son under obligation to disclose fully the facts known to himself with reference to the property interests conveyed by the father at the time he signed these papers. This the son did not do. Appellee cannot be held to have intended this as a gift when he was ignorant of the right or title that he had in the property. *Douglass* v. *Littler,* 58 Ill. 342; 1 Story's Eq. Jur. (12th ed.) sec. 122.

The points raised by appellant's various assignments of error have not been taken up and considered separately, but what has been said disposes of all the material questions raised on the appeal.

On this record the decree of the circuit court was fully justified, and it will therefore be affirmed.

*Decree affirmed.*