## MOYER v. BLOOMINGDALE et al.

(Supreme Court, Appellate Division, First Department. March 17, 1899.)

1. FRAUDULENT CONVEYANCES—BONA FIDE PURCHASER—QUESTION FOR JURY.
    Where evidence offered by a purchaser of property from a fraudulent vendor, to show himself a bona fide purchaser for value, is contradictory, in many respects improbable, and in conflict with that of other witnesses, the question of bona fides on all the evidence is for the jury.

**2. SAME—EVIDENCE.**

    K., being insolvent, purchased a large amount of goods on credit, intending not to pay for them, which he packed in his livery stable, but did not use or display for sale. K. and defendant were relatives and on intimate terms. Defendant recommended him for credit, though he was insolvent, and loaned him $5,000, without security, at 12 months. Three months later K., in consideration of a further advancement of $6,000 to pay "confidential debts," executed a demand note and mortgage to defendant on all the property, the cost price of part of which was $25,850, and immediately absconded. Defendant foreclosed the mortgage at once, buying the property in bulk through one of his clerks for $3,150, and directed the clerk "to have enough people on hand to remove the property at once, as there was danger that third parties would seize it." *Held*, in an action by one of K.'s creditors to recover property so fraudulently purchased by him, that the evidence would have warranted a finding that defendant was not a bona fide purchaser, and that the question should have been left to the jury.

**3. SAME—NOTICE—INADEQUACY OF PRICE.**

    Gross inadequacy of price at which one in possession of goods offers to sell them is of itself evidence to the purchaser of an infirmity in the vendor's title.

    Appeal from trial term.

    Action by Harvey A. Moyer against Lyman G. Bloomingdale and another, impleaded with others. From a judgment in favor of defendant Bloomingdale, and from an order denying plaintiff's motion for a new trial on the minutes, he appeals. Reversed.

    Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

    Franklin Pierce, for appellant.

    S. Livingston Samuels, for respondents.

    BARRETT, J. The action is brought to recover the value of two buggies, sold by the plaintiff to the defendants Morris and Benjamin Kraus on the 26th day of February, 1894, with damages for their detention. These buggies, with a large amount of other property, were formally mortgaged by the defendants Kraus to the defendants Lyman G. and Joseph B. Bloomingdale on the 6th day of August, 1894, as alleged security for a debt of over $11,000. The mortgaged property was, almost immediately thereafter, sold under the mortgage, and bought in by the said defendants through one of their clerks. The plaintiff contends that the original sale was vitiated by fraud, and that he may recover his property from the possession of the defendants Bloomingdale upon the ground that they are not bona fide transferees thereof for value. The jury found a verdict for the plaintiff against the defendants Kraus. The court, however, dismissed the complaint as to the defendants Bloomingdale, and the plaintiff appeals.

    It is conceded that there was abundant evidence to show that Kraus Bros. bought the goods originally with the intention not to pay for them, and also that they gave the chattel mortgage to the defendants Bloomingdale with the intention of hindering, delaying, and defrauding their creditors. It is also conceded that there was evidence which, to quote from the respondents' brief, "may have been sufficient to carry the case to the jury as to whether or not Bloom-

ingdale Bros. had notice of the intention of the mortgagors in making this mortgage to hinder, delay, and defraud their creditors generally." There was, in fact, ample evidence of such notice, which will be adverted to later. The respondents, however, contend that there was no evidence showing knowledge or notice on the part of Bloomingdale Bros. of the fraudulent intention of Kraus Bros. in the original purchase of the property, and that this fact is conclusive against the plaintiff. We are unable to concur either in the premise or the conclusion. The proposition seems to be that, if the respondents had no knowledge or notice of the primary fraud in the original purchase, they are bona fide purchasers for value, although in their own purchase from the fraudulent vendees they participated in the latter's subsidiary fraud, and made such purchase to enable them to cheat their creditors. This seems to us an extraordinary proposition. Williams v. Tilt, 36 N. Y. 319, is cited as an authority in support of it, but that case gives color to no such doctrine. It was an action to rescind a contract of sale induced by fraud, and to recover the goods from one who had advanced money upon them to the vendee, without notice of the fraud, but at a usurious rate of interest. It was held that usury was a question between the borrower and the lender, and not between the lender and a stranger; that, as the original vendor was a stranger to the transaction between his vendee and the second purchaser, he could not assail the latter's transaction for usury; and consequently that the question of the second purchaser's bona fides depended upon the inherent nature of the transaction between him and his vendor. The fact that there was usury in the contract did not, said Parker, J., "at all affect the relative rights and equities between him [the second purchaser] and the original vendor." It is true that the learned judge observed that, if the second purchaser is free from any privity with the original fraud, "he is a bona fide purchaser, without reference to his standing as to his immediate vendor. It was not good faith to him which is the subject of inquiry, but to the original owner." These latter observations had relation to the particular facts then under consideration. They served to illustrate the proposition that the second purchaser was none the less a bona fide transferee for value, because the contract with his vendor was such that the latter might elect to avoid it for usury. Where that was the only infirmity in the second purchase, the essential subject of inquiry was good faith as to the original owner. An entirely different question would have been presented had the second purchase been tainted with downright fraud, either upon the immediate vendor or upon some third person or collective body. The court criticised the statement in Ramsdell v. Morgan, 16 Wend. 574, that "there is a solecism on the face of the expression, 'a bona fide purchaser on usury.'" We apprehend there would have been no such criticism had the suggested solecism been, "a bona fide purchaser on fraud." Here, however, the fraud in the second purchase—for the mortgage transaction was essentially a purchase—was not limited to that subsidiary transaction. It was a fraud upon all the creditors of Kraus Bros., and consequently upon the plaintiff. The respondents' reasoning upon this head savors of

travesty. It makes the bona fides of their purchase depend, not upon its inherent honesty or dishonesty, but upon the attitude of the defrauding creditor. If the latter affirms the original purchase, the respondents are not, as the reasoning concedes, bona fide purchasers for value, because their purchase was to defraud their vendor's creditors, and the plaintiff is then one of those creditors. If, however, the plaintiff rescinds the original purchase, then the respondents are, they argue, bona fide purchasers, because the plaintiff is no longer such creditor, but simply the owner of the property sought to be recovered. This distinction is quite too fine. The final fraud upon the creditors generally was but the completion of the original fraud by which this property was obtained. This final fraud made the original fraud practically effective and beneficial to Kraus Bros. If they had used the proceeds of their originally fraudulent purchase to pay their creditors,—if such had been the intent of the second sale,—it would have been a case of robbing Peter to pay Paul. As it was, they robbed Peter to pay no one, but simply to pocket the sum which they were, by the respondents' connivance, enabled to realize from the fraudulently purchased goods.

We quite agree with the rule laid down in a somewhat similar case in Connecticut (Lynch v. Beecher, 38 Conn. 490), where the learned court said that:

"Such a purchaser [that is, a purchaser from the fraudulent vendee], in order to hold, must be a purchaser in absolute good faith and for value, and, if his title is tainted with any fraud, the court will not be particular to inquire into its generic character. It is enough that he is not an honest purchaser."

But, further, there was sufficient evidence to go to the jury upon the question of the respondents' knowledge of the Krauses' original fraud. A brief statement of the facts, considered in their relation to a well-settled rule of law, will suffice to show this. When the plaintiff proved fraud in the Krauses' original purchase, he was entitled to rest, even as against Bloomingdale Bros. The affirmative was then upon the latter. Devoe v. Brandt, 53 N. Y. 462; Seymour v. McKinstry, 106 N. Y. 240, 12 N. E. 348, and 14 N. E. 94; Stevens v. Brennan, 79 N. Y. 258. The only evidence tending to support that affirmative was furnished by one of the respondents, Mr. Lyman. Bloomingdale. The testimony of his brother, Emanuel, did not touch the actual transaction of the chattel mortgage. Mr. Lyman Bloomingdale's testimony was that of an interested defendant. It was weakened on cross-examination. It was in many respects improbable. It was in conflict, in some important particulars, with the testimony of other witnesses. There were, indeed, many circumstances from which inferences contrary to the main facts testified to by him might have been drawn. The case, therefore, in its most favorable aspect for the respondents, was for the jury upon the credibility of this witness, and the weight which should be given to his testimony. Honegger v. Wettstein, 94 N. Y. 261; Kelly v. Burroughs, 102 N. Y. 95, 6 N. E. 109. Even if he had been a disinterested witness, the question of bona fides, upon all the evidence, would still have been for the jury. These were some of the facts. Towards

the end of the year 1893, Kraus Bros. leased of the respondents a stable near the store of the latter, for the purpose of carrying on the horse and carriage business. They then owed several thousand dollars, and seem to have no assets, except a few carriages and some horses, estimated at from 60 to 90, many of which were unpaid for. From that time on, until their failure in August of the following year, they purchased goods from every quarter where they could obtain credit. In May, 1894, these purchases amounted to $60,000, and substantially all of the goods were left unpaid for. They were not displayed for sale, but were packed into a small compass, so that as much property as possible might be gotten into the building. The Bloomingdales were relatives of the Krauses by marriage, and quite intimate with them, and Mr. Lyman Bloomingdale was repeatedly in their store. He admits that on one occasion he went all over their stock. The respondents' purchasing agent also was frequently there. The respondents had had previous dealings with the Krauses; had lent them money; and had foreclosed a mortgage upon certain property of theirs in Brooklyn, which mortgage had been given to the Bloomingdales as security. In spite of declarations to the contrary, it might fairly have been inferred by the jury that the respondents realized that Kraus Bros. had no means to pay for so large a stock as they were laying in; and yet they recommended them for credit. In May, 1894, they lent $5,000 to the Krauses, upon their note at 12 months, without security, and without making any investigation as to their financial condition. Mr. Lyman Bloomingdale admits that this transaction was unprecedented. Matters then seem to have remained in statu quo until the 3d of the following August, which was a Friday, when Mr. Bloomingdale says that he received a telephone message from one of the Krauses requesting an interview the next day (Saturday, August 4th), at noon, at a lawyer's office; that this telephone message caused him considerable anxiety, and in fact aroused in his mind suspicion that the Krauses must be in financial difficulties. He protests, however, that, until the interview actually took place, the next day, he had no knowledge of their actual condition or of the proposition which they were about to make to him. Yet a witness named Tanzer, who was one of his own clerks, testifies that, according to his recollection, Mr. Bloomingdale, on the Saturday morning in question, introduced him to the very marshal who subsequently auctioned off the property, and so introduced him as the person who was to bid at the sale. This, it will be observed, was before Mr. Bloomingdale went to the lawyer's office to meet Morris Kraus, and consequently before, if Mr. Bloomingdale is to be believed, any arrangement had been made for the chattel mortgage, much less for a sale thereunder. It is true that Tanzer subsequently admitted that his introduction to the marshal might have been upon the following Monday, but this admission is coupled with an equally incriminating statement, namely, that the witness was instructed by Mr. Bloomingdale to make an inventory of the goods in the Krauses' stable, and that this instruction was given on a day prior to that on which he was introduced to the marshal. So that, if the introduction to the marshal was on Saturday, the direction to make the inventory must

have been given on Friday, before even the receipt of the telephone message. If, however, the introduction was on Monday, the direction as to the inventory must have been on Saturday morning. In either case, the witness gave testimony which tended to show. that Mr. Bloomingdale contemplated taking the goods before he met Morris Kraus on Saturday, and before, if his own statement is to be credited, he knew the situation or purpose of that firm. Mr. Bloomingdale's version of what took place on Saturday, when he met Morris Kraus in the lawyer's office, is, in brief, to the following effect: He was told that the Krauses were in difficulty; that they wished to secure him; and that, if he would advance them an additional $6,000 for "confidential debts," they would give his firm a chattel mortgage on their property to secure the entire indebtedness, antecedent and present. To this he acceded, and the mortgage was accordingly executed and delivered on the following Monday. It was in terms to secure the payment of a demand note for $11,573.81. This represented the $6,000 of cash, the amount of the old $5,000 note, which had yet some nine months to run, and a small sum due on another transaction. The very next morning (Tuesday), at 9 o'clock, the Bloomingdales sold all the property in the Fifty-Ninth street stable under this mortgage. The sale was of the whole stock in bulk. No detailed description of the property was read, and no bids on specific articles received. Only a handful of people were present, and but three bids made,—the first two by the respondents themselves and the third by Tanzer. The property was knocked down on the third bid for $3,150. Tanzer testifies that Mr. Bloomingdale directed him to cease bidding after the third bid was made. He also says that he had been previously instructed to have enough people on hand to take the property away immediately, as there was danger that third parties would seize it. The cost price of the property thus sold was, according to the plaintiff's evidence, $25,850; and this sum must have been considerably enhanced by other property which was covered by the mortgage, namely, all the stock in certain premises in Brooklyn, and the "stable utensils, and fixtures, safes, and furniture."

The jury might fairly have found, upon these and other facts which need not be detailed, that the transaction in question, though in form a mortgage, was in substance a sale; that the gist of it all was that the Krauses, having fraudulently purchased a large amount of property without the slightest intention of paying for it, desired to realize what they could therefrom, and then, as they did, abscond with the money; that the Bloomingdales took the property at a grossly inadequate price, and with every reason to believe that the Krauses were willing to let them have it for such a price only because they had acquired it fraudulently. The Krauses might have sold the property for a decent price, and yet have made the sale with intent to defraud their creditors generally. When, however, they were willing to take so inadequate a sum, their act spoke plainly of some infirmity in their title. People do not ordinarily sacrifice in this manner property honestly acquired. The extreme haste evinced by the Bloomingdales, the character of the sale, and their subsequent proceedings with regard to the property, all indicate that they were impressed with this infirmity.

in the Krauses' title, quite as much as with the latter's present and immediate intent to defraud. And certainly the jury might reasonably have so found. The action of the respondents, after the sale as well as before, indicates a realizing sense of this on their part; for they did not keep a full and accurate record either of the property thus received or of its disposition. Inadequacy of price, when very great, is of itself evidence of an infirmity in a vendor's title. Green v. Humphry, 50 Pa. St. 212. We have here not only this inadequacy, but numerous circumstances pointing in the same direction.

We think, therefore, that the nonsuit was erroneous, and that the judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.