(No. 26903.—Decree affirmed.)

ADOLPH F. ELSASSER, Appellee, *vs.* BERNADINE MILLER, Appellant.

*Opinion filed May 20, 1943.*

MADDEN, MECCIA & MEYER, (MARLOW J. MADDEN, of counsel,) for appellant.

BENJAMIN H. VANDERVELD, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Appellant, Bernadine Miller, seeks by this appeal to reverse a decree of the superior court of Cook county which set aside a deed by appellee, Adolph F. Elsasser, conveying to her his homestead located at 1124 Cleveland avenue, Park Ridge, Illinois. The deed contained a clause which recited that a part of the consideration was the agreement of appellant to furnish the grantor, as long as he should live, a comfortable home, including room and board. The chancellor heard the evidence on the issues raised by the complaint and answer, and in the decree embodied findings that appellee had proved the allegations

of his complaint; that the execution of the deed was without actual consideration, was not the free and voluntary act of appellee, and was not the instrument he understood he was executing; and that the instrument constitutes a cloud on appellee's title. Appellant has assigned, in general terms, a number of errors, but all of them may well be inclosed in the contentions which are covered in the last assignment, that the decree is contrary to the law and the evidence.

.The allegations of the complaint which are denied by the answer are that appellee's son, Adolph K. Elsasser, and appellant, conceived a design to deprive appellee of his property; that in furtherance of that design and with intent to wrongfully obtain his property, they insisted upon appellee making provision for appellant, in the event of appellee's death; that while he was suffering a dizzy spell in February, 1941, resulting from a fall, appellant and appellee's son were alarmed that appellee might die without leaving something "black on white;" that the son made threats and both threatened to throw him out; that under this duress and mental confusion and in fear of physical violence, appellee was interviewed by a lawyer brought to his home without his request, who, with the son and appellant, represented that he should sign an agreement already prepared so he could have a roof over his head; that relying on the lawyer's statement that the paper could be cancelled if he so desired, believing it to be an agreement for board and room, and under pressure of said parties, he signed a paper which he later discovered was a deed, a copy of which is set out in full in the complaint; that as soon as he discovered it was a deed, he protested and demanded its return, which was refused, and he was informed to leave the premises, which he did a few days after signing the deed and in consideration of his health and safety; and that the consideration, if any, was so grossly inadequate and so completely failed, that it would be inequitable to permit the conveyance to stand.

Appellant denied the above allegations and averred that appellee voluntarily left and failed to perform his part of the agreement, and that she has been compelled to pay the gas, electric, water and heating bills to keep the home livable and that she is, and always has been, ready, willing and able to furnish him a comfortable home.

The clause in the deed, which was executed February 22, 1941, around which the controversy revolves, reads as follows:

"As a part of the consideration of this conveyance the grantee herein agrees to furnish the grantor herein, as long as he shall live, a comfortable home, including room and board. In addition to this conveyance the said grantor agrees to pay during his lifetime the general taxes on said premises and the expense of heating the same, and agrees to pay for the gas, electricity and water for the operating of said premises as a home, and the insurance premiums for fire and windstorm insurance in the improvements on said premises. All of said expenses are to be paid promptly as the bills therefore are rendered from time to time.

"It is further understood and agreed, that the obligations herein mentioned shall be binding upon the heirs, executors, administrators and assigns of the respective parties."

The instrument in question was executed under the following circumstances. Appellant, who had been employed at Montgomery Ward & Company for several years, became acquainted with appellee and his wife while they lived in Chicago, about twelve years prior to the hearing. She met them through their son, to whom she was engaged, and she began boarding and rooming with them, for which she paid $25 a month. When appellee sold the Chicago home and moved to the Park Ridge property in question in 1936, appellant went with them and continued as a roomer and boarder until appellee's wife died on October 27, 1939. After that she continued to reside there in the capacity of roomer, boarder, and housekeeper. After the death of appellee's wife, appellant ceased paying for her room and board, because, as appellee said, it was not right that she keep on paying. However, she

paid for the food, or the major part of it, prepared break-fast before going to her work, and supper when she returned in the evening. She made the beds, cleaned the house, worked in the garden, did the washing and ironing, and fired the furnace of evenings.

The deed was executed in the dining room, on Washington's birthday, in the presence of appellee's son, the lawyer who prepared it, and appellant. After it was signed, at the suggestion of the attorney, appellee handed the original to appellant and kept a carbon copy. He paid the attorney $5 for his services and appellant afterwards reimbursed the attorney for the recording fee paid by him when he had it recorded for appellant. About three days after the deed was made, appellee took his carbon copy down the street to a man he thought knew more than he did about such matters and was told that he had deeded his home to appellant. He was then seventy-one years old, and had about $4800 which he had received from the sale of real estate on Leclaire avenue, in Park Ridge.

On April 4, 1941, appellee packed up his things and left the home involved in this proceeding, while his son and appellant were both absent. He went to the home of one Bertha Tenbusch, where he has continued to board and room, paying therefor the sum of $25 a month.

Appellee testified in response to leading questions by both court and counsel. As to whether there was any talk between him and his son about the real estate before he signed the paper, he replied: "Why, yes, they told me to make a will." Responding further to leading and suggestive questions he fixed the time of the conversation as in the spring of 1941. He also testified that appellant once struck him and that his son struck him a half-dozen times, because he mentioned "fancy house," referring to appellant and the son living there in an unmarried status, and that his son said if he did not get the property, he would put appellee in an insane asylum; that on one occasion the

son called the police who came and searched him to see if he had a weapon, and that the police told him he had better go to bed. Appellant explained the incident by stating that appellee was drunk on that occasion.

Appellee's testimony was further to the effect that he did not request his son to call the attorney, that he did not ask the attorney to prepare the paper, that it was not read to him either before or after he signed it, and that when the attorney placed the paper before him, he asked what it all meant and the attorney said: "This will give you a comfortable home for the rest of your life;" that he asked where to sign and when shown, he signed it. He also testified that the attorney had come to his home some weeks previously and wanted him to make a will. He also said that right after he executed the paper he started eating at a restaurant because of appellant's cooking and that the food was only half-cooked.

The testimony of the son and of appellant flatly contradicts that of appellee. They denied striking him, denied making any threats about placing him in an asylum, denied ever requesting him to make a will, and testified that appellee made no complaint about the cooking or the food; that he started drinking after his wife died and had increased the habit until he had been intoxicated three or four times a week. Appellant was corroborated in this by Clara Monson, a neighbor, who saw him stagger home on several occasions.

The attorney who prepared the deed, testified that he went to appellee's home in Park Ridge about ten days or a week prior to the time the deed was executed; that in the presence of his son and of appellant, appellee told the attorney that he had decided to transfer the property to appellant as she was furnishing the eatables and doing the work and that appellant did not want to continue doing those things without some chance of more compensation; that appellee asked him to arrange to have

it transferred and that he advised appellee how to protect himself by incorporating the agreement in the deed; that appellee gave him the terms to incorporate and that he prepared the deed and took it to appellee's home; that after explaining the contents to both parties, appellee signed it and delivered it to appellant. According to his testimony, the only conversation of the parties at the time the deed was executed was the discussion as to what each understood they were to do toward carrying out the agreement. Appellee did not say anything to the attorney about his son striking him. The attorney testified that the deed was read over to appellee before he signed it and it was discussed with appellee. Appellee did not appear to the attorney to be dizzy on that occasion and, in the opinion of the attorney, appellee was in full possession of his faculties at the time he executed the deed.

According to the testimony of Clara Monson, who had a conversation with appellee in his home on Sunday, February 15 or 16, 1941, he said he thought he would give the property to appellant and that if she gave him a home and did his washing and fed him, that would be all he would ask. She was a frequent caller at appellee's home, saw the meals several times when she ran in unexpectedly and never saw anything about them to criticise. The food was good in quality and sufficient in quantity. General conditions about the house were neat and clean. Appellee's clothing was always neat looking. Appellant washed and ironed on Saturdays, baked, cooked, sewed and cleaned house. She did canning and preserving. To this witness appellee both criticized and praised appellant. When he had a crabby spell he "jumped all over her," then he would praise her for doing a lot of work and help.

According to appellee's testimony, the attorney had been to see him about making a will prior to the date the deed was made. They discussed a contract by which appellant would agree to furnish appellee a home, including

room and board, as long as he should live. It is apparent the two things fixed in the grantor's mind were, first, a will, which would pass the title at his death, and second, a contract which would leave the title in him until the contract had been fully performed. As further evidence that he was to retain possession and control of the property, he directed that he was to pay the taxes and insurance, the gas, water, electric and heating expense for operating it as a home. The attorney admitted that he might have told appellee that if he was not satisfied all he had to do was to come to his office and he would set it aside, and appellee testified positively to that statement. It is apparent from all the record evidence that the instrument was regarded by both parties as a contract and that no immediate title was to pass to the grantee. Appellant's counsel insists that the unsupported proof of appellee is insufficient to overcome the *prima facie* proof of execution and delivery of the deed made by the certificate of acknowledgment, and cites *Houlihan* v. *Morrissey,* 270 Ill. 66. In this case appellee's contention is, not that he did not sign and acknowledge the instrument in question, but that he signed and acknowledged the same under a misapprehension as to its contents, not understanding that it contained a present conveyance of the title to his property. We have held in *Union Colliery Co.* v. *Fishback,* 299 Ill. 165, that a claim by a grantor that she signed and acknowledged an instrument under a misapprehension as to its contents does not necessarily impeach or contradict any part of the certificate of the notary public. By reason of our holding in this later case, we think that the case cited by appellant upon this question is inapplicable.

We find no difficulty in reaching complete agreement with the contention made by appellant's counsel that a contract to provide a comfortable home, including room and board, for the grantor, constitutes a sufficient consideration to support the deed, if fairly and understandingly made and accepted by both parties, as was held by this

court in *Sturtevant* v. *Sturtevant,* 116 Ill. 340. But we are unable to conclude, from a careful consideration of all the evidence, that the trial court's finding that the instrument in question was not what appellee understood he was executing, is contrary to the manifest weight of the evidence. Accepting such finding, it cannot be said that the conveyance was understandingly and fairly made and accepted by the parties. Accordingly, the many decided cases cited by appellant's counsel, which we have considered with extreme care, are not controlling in this case. The witnesses in the instant case were examined in open court. The chancellor saw and heard them testify and this court will not disturb his findings unless it is apparent that they are clearly and palpably against the manifest weight of the evidence. *Fabrice* v. *Von der Brelie,* 190 Ill. 460; *VanVleet* v. *DeWitt,* 200 Ill. 153; *Hardy* v. *Dyas,* 203 Ill. 211; *Roche* v. *Roche,* 286 Ill. 336.

In the instant case appellant testified that appellee had been intoxicated three or four times a week. He was called from the bathroom, where he had gone to take his medicine, and went to the dining room on February 22, 1941, where, without any advance notice, he found the attorney who had been called by appellant's fiance, with a prepared instrument, represented as a contract, ready for his signature. We entertain no doubt that the attorney acted in good faith, and supposed what he was doing was the desire of both parties and that they understood the legal effect of the instrument he had prepared, (*Yoakum* v. *Yoakum,* 77 Ill. 85,) but we are of the opinion that appellee did not comprehend the true nature of his act from what the attorney told him.

The chancellor's finding that the execution of the deed was not the free and voluntary act of appellee is not contrary to the manifest weight of the evidence.

The holding of the court in the instant case was that the deed executed was not the free and voluntary act of appellee, not because some fraud, duress or undue influ-

ence was impelling him and caused him to substitute some-one else's mind for his own, but because he did not understand the nature and import of his act and it was not his free act and deed. There was ample disclosure of a mental infirmity from age. The inference from all the evidence is clear that appellant had informed appellee that she did not care to continue keeping house and caring for him unless she had something "black on white" to assure her of additional compensation. There was nothing improper in that regard. (*Ropacki* v. *Ropacki,* 341 Ill. 301.) But when his age and weakness are considered in connection with the grossly inadequate consideration and the contract by which he would be required to pay approximately as much for taxes, insurance, gas, electricity, water and heating as his board and room would cost, the chancellor was justified in finding that appellee did not comprehend his act and was thereby led into an improvident and unconscionable bargain from which the trial court very properly relieved him. (*Huiller* v. *Ryan,* 306 Ill. 88; *Page* v. *Keeves,* 362 Ill. 64.) Mere want or inadequacy of consideration is, standing alone, no ground for cancelling a deed; but if, however, a person has been induced to part with a thing of value for little or no consideration, equity will seize upon the slightest circumstance of oppression, fraud, or duress for the purpose of administering justice in the case at hand. (9 Am. Jur. 370; 4 R. C. L. 500; *Kronmeyer* v. *Buck,* 258 Ill. 586.) We have held in the case of *Morgan* v. *Owens,* 228 Ill. 598, where an aged and infirm man, at the instance of his son, executed, without reading it, a quitclaim deed to his daughter, thinking that he was thereby releasing a dower interest therein when in fact he was conveying an interest in the fee, his deed, executed under such circumstances, should be cancelled and rescinded, since, the minds of the parties having failed to meet upon the same matters, no agreement was really made. Also in the case of *Gercke* v. *Gercke,* 331 Ill. 413, this

court affirmed the action of the trial court in setting aside a deed from a husband to the son of his wife by a former marriage, executed by the grantor under the erroneous belief that he was signing a contract for the conveyance of the property to be held by himself and the son in joint tenancy in case the grantor should survive his wife. The ground for relief where a deed or contract is executed under a misapprehension as to the contents, nature or character of the instrument is that the misunderstanding precluded mutual assent to the terms of the contract, and, consequently, that it is nonexistent.

For the foregoing reasons, the decree of the superior court is affirmed.

*Decree affirmed.*