Robert W. RYAN, Plaintiff,

v.

Norman D. WEINER, Defendant.

Civ. A. No. 12178.

Court of Chancery of Delaware,
New Castle County.

Date Submitted: Jan. 28, 1992.
Date Decided: March 13, 1992.
Date Revised: March 19, 1992.

Merril L. Zebe, and Beth L. Jawitz, of Community Legal Aid Society, Inc., Wilmington, for plaintiff.

H. James Childerston, of Childerston, Froehlich, Funk, Healy & Locke, P.A., Newark, for defendant.

## OPINION

ALLEN, Chancellor.

In this action Robert Ryan seeks, *inter alia*, an order canceling a deed to his house that he gave to Norman Weiner in May 1984. Ryan asserts that in making that transfer he was deceived by Weiner and only recently came to understand that the deed in question was not simply a security interest. Mr. Weiner denies all aspects of the complaint. The case has been through a brief trial.

While I do not reach the question whether Weiner in fact deceived Ryan by making false statements to him upon which Ryan relied, I do conclude that the transfer in question represents a shocking and oppressive transaction; that Mr. Weiner took the grossest advantage of Mr. Ryan, who found himself in weakened and distressed circumstances, and that Weiner manipulated their dealings to accomplish that result. In short, for the reasons set forth below, I conclude, that this represents that unusual case in which a court of equity cannot let stand an executed contract but is obligated to grant the remedy of rescission.

## I.

Mr. Ryan is a 69 year old man with a ninth grade education. He retired about ten years ago from his work as a laborer and subsists on a small pension and social security benefits. In 1971, Ryan and his now deceased wife purchased a modest house located at 928 Pine Street in Wilmington, Delaware to live in. The price was $8,600. Most of that was borrowed and repayment was secured by a first mortgage.

After about 12 years of mortgage payments, Mr. Ryan (who had become a widower in the interim) fell badly behind in his mortgage payments. The monthly payment was $98 per month at that time. By April 1984, he owed in excess of $1,000 in arrearages.

It is agreed that Ryan's house had a fair market value at that time of $19,800. (Stip. Facts ¶ 18). The balance of the loan secured by the mortgage was less than $8,000. In March 1984, the mortgage lender instituted foreclosure proceedings. Mr. Ryan did not answer the complaint and, on April 16, 1984, a default judgment in the amount of $7,843.26 was entered. A sheriff's sale was scheduled for June 12, 1984.

Ryan testified that throughout this period he was an active alcoholic.

Defendant, Norman Weiner, was (and is) a licensed real estate broker who engages in the business, *inter alia*, of buying and leasing inner-city houses. On Sunday, May 13, 1984, Weiner arrived at Ryan's home unannounced and informed Ryan that he could help him keep his house. The parties had not met prior to that. They disagree about what was said at that meeting. Ryan reports that he understood that Weiner offered to lend him the money to make

up the back payments and to take a deed to secure repayment. Weiner reports that he offered to buy the house and to let Ryan continue to live in it as a tenant. They agree, however, that Weiner did not offer to make a cash payment to Ryan.

Weiner showed Ryan no papers but told him he would pick him up the following morning to complete the transaction. When Weiner left that afternoon, he took Ryan's original deed to the property which he said he would hold in his safe deposit box.

At 8:00 a.m. the following day, Weiner picked Ryan up at his house and drove him to the office of Harold Green, a Delaware lawyer, who represented Weiner in real estate transactions and is also a close personal friend and relative. At Green's office, Ryan was asked to sign several documents which Weiner explained were necessary. Green did not explain any of the documents to Ryan, nor did he speak to him during their ten-minute meeting. Neither Weiner nor Green advised Ryan of his right to seek independent legal advice concerning the transaction. (Tr. 26–27, 182). At trial, Green testified that he had no specific recollection of his meeting with Ryan and was unable to confirm any of the alleged conversations or events that took place between the parties. Ryan says that he signed the documents without reading them because he trusted the defendant's statements that the papers were loan documents. (Tr. 19, 28).

In fact, Ryan did not sign loan documents on May 14, 1984, but signed a deed transferring the Pine Street property to Weiner. (Pl.'s Exh. 1). According to Ryan, he did not see the front page of the deed containing the property description when he signed the back of the deed and neither Weiner nor Green told him that he was signing a deed. (Tr. 20, 82). He also claims that he did not understand a one-sentence document that he signed in Green's office, assigning all money held in escrow to Weiner. (Pl.'s Exh. 9). Ryan also signed a document which he later learned was a settlement sheet. He testified that when he signed the document on

May 14, 1984, it contained no figures and only had about two inches of writing on it. The document now bears the date May 15, 1984 and contains many figures. (Pl.'s Exh. 2 & Tr. 23). Ryan was not given any copies of documents that he had signed. (Tr. 26, 234).

Before Weiner had gone to Ryan's house, Mr. Green had requested and received from the mortgagee two documents: a "Sale Subject to Mortgage" document (now dated May 14, 1984) and an "Insurance Information and Assignment of Escrow." The assignment form required Ryan's signature and required that Seller's address be set forth. (Pl.'s Exhs. 8 & 16). But, Weiner, not Ryan, signed the Assignment of Escrow form, completing the section which requested the seller's forwarding address with Weiner's own P.O. box number. The forms were then sent back to the mortgage company as an enclosure with a letter from Green of May 15, 1984. (Pl.'s Exh. 14). Ryan never saw the Sale Subject to Mortgage Statement or Insurance Information and Assignment of Escrow form.

The May 14, 1984 deed signed by Ryan recites that $7,000 in consideration was paid to him. He did not, however, receive any cash, nor did Mr. Weiner ever pay off the balance of the outstanding mortgage on the property or satisfy the default judgment entered against Ryan. Weiner did thereafter pay the mortgage company $1,898.30 in order to bring the loan current. But Weiner did not sign any documents assuming the legal obligations of the mortgage. (Tr. 113–115).

The result of the transaction was that Ryan transferred ownership of his property to Weiner without receiving any part of the financial value of the then equity in the property of approximately $12,000. Ryan has remained personally liable for paying off the mortgage balance under the mortgage bond and note.

\* \* \*

Following the May 13 and 14 meetings with Weiner, Ryan continued to live in the house. A lease was executed with an effective date of May 14, 1984. (Pl.'s Exh. 3). Weiner steadily increased Ryan's monthly

payments over intervening seven years from $100 a month to $310 per month. (Stip. Facts ¶¶ 20–25). During the same period the mortgage payment also increased, but only from $93 in 1984 to $120 in 1991. (Stip. Facts ¶¶ 13 & 14). Over the course of this arrangement Ryan paid Weiner the following amounts:

| Time Period | Number of Monthly Payments | Amount | Total |
|---|---|---|---|
| July 1984 | 1 | $100 | $ 100 |
| Aug. 1984—June 1985 | 11 | 160 | 1,760 |
| July 1985—Oct. 1985 | 4 | 260 | 1,040 |
| Nov. 1985—Dec. 1988 | 38 | 270 | 10,260 |
| Jan. 1989—June 1990 | 18 | 290 | 5,220 |
| July 1990—Apr. 1991 | 10 | 310 | 3,100 |
| Total: | | | $21,480 |

Over the years, while Ryan paid him a total of $21,480, Mr. Weiner expended $12,-149.27 on the mortgage, insurance, taxes, sewer and water charges, including the amount paid to bring the mortgage up to date in 1984.[1]

The two parties had a significant amount of contact—Weiner transported Ryan to and from his bank on the third day of each month so that Ryan could cash his Social Security check in order to make monthly payments, and Weiner hired Ryan to do odd jobs at Weiner's residence. The issue of ownership of the property arose only on two occasions. On both occasions, Ryan asked for his deed to the property in order to apply for a loan, and on each occasion, he was put-off by Weiner but, he says, nevertheless left with the impression that he was still the rightful owner of the property. (Tr. 42–43).

Before his May, 1991 payment was due, Ryan concluded that he had paid Weiner a total amount in excess of the amount of the mortgage on the property and the amount of Weiner's "loan." He refused to make any more monthly payments to Weiner in May, 1991. Weiner promptly commenced a summary action in the justice of peace court to evict Ryan. On Ryan's motion, this court stayed that proceeding, concluding that issues of the quality of Weiner's title itself and Ryan's alleged right to have Weiner's deed canceled were remedies not available in the justice of peace court.

II.

The right of competent persons to make contracts and thus privately to acquire rights and obligations is a basic part of our general liberty. This ability to enter and enforce contracts is universally thought not only to reflect and promote liberty, but as well to promote the production of wealth. Thus, the right to make and enforce contracts is elemental in our legal order. But not every writing purporting to contain a promise or every document purporting to make a transfer will be given legal effect. A large body of law defines when valid contracts are formed and when and how they can be enforced.

 Contracts or transfers induced by fraudulent misrepresentations, for example, can be avoided. Similarly, a lack of legal capacity or the existence of duress can lead a court to declare a promise unenforceable or a transfer voidable. *See, e.g.,* A. Farnsworth, *Contracts* §§ 4.1–4.20 (1982). Ordinarily, an evaluation of relative values of the bargain to the parties will not provide a basis for such judicial action.

---

1. Ryan asked Weiner to make repairs to the property since it was in a deteriorated condition. Weiner apparently purchased material for repairs to the property but left the repair work to be completed by Ryan or his friends. (Tr. 41–42).

■ It is general rule, recited by courts for well over a century, that the adequacy or fairness of the consideration that adduces a promise or a transfer is not alone grounds for a court to refuse to enforce a promise or to give effect to a transfer. *See, e.g.,* 1 A. Corbin, *Corbin on Contracts* § 127 (1963 & Supp.1991) (adequacy of consideration); 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 926 n. 7 (citing numerous federal and state cases). This rule, present in 17th and 18th century cases, achieved its greatest dignity in the jurisprudence of 19th century classical liberalism. *See, e.g.,* P. Atiyah, *The Rise and Fall of Freedom of Contract* 146–152 & 169–180 (Clarendon Press Oxford 1979). Thus, the classical liberal's premise concerning the subjectivity (and thus non-reviewability) of value [2] has plainly been a dominant view in our contract law for a very long time. Countless cases from the 19th and 20th centuries could be cited for the proposition that "mere inadequacy of price" will not invalidate a contract or a transfer. But as standard as that generalization is, it has not precluded courts, on occasion, from striking down contracts or transfers in which inadequacy of price is coupled with some circumstance that amounts to inequitable or oppressive conduct. That is, the "rule" that courts will not weigh consideration or assess the wisdom of bargains, has not fully excluded the opposite proposition, that at some point courts will do so even in the absence of actual fraud, duress or incapacity. *See* 2 Devlin, *Real Property and Deeds* § 814 (1911); Story, *Commentaries on Equity Jurisprudence,* (Cambridge Press 1835), (Arno Press Reprint 1972) §§ 238, 244–247.

The notion that a court can and will review contracts for fairness is apt for good reason to strike us as dangerous, subjecting negotiated bargains to the loosely constrained review of the judicial process. Perhaps for this reason, courts have evoked this doctrine with extreme reluctance and then only when all of the facts suggest a level of unfairness that is unconscionable.

The applicable principle is ancient. It was old when Justice Story summarized it in 1835:

> Of a kindred nature, to the cases already considered, are cases of bargains of such an unconscionable nature, and of such gross inequality, as naturally lead to the presumption of fraud, imposition, or undue influence. This is the sort of fraud, to which Lord Hardwicke alluded in the passage already cited, when he said, that they were such bargains, as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other, being inequitable and unconscientious bargains. Mere inadequacy of price, or any other inequality in the bargain, is not, however, to be understood as constituting *per se* a ground to avoid a bargain in Equity....

> \* \* \* \* \* \*

> Inadequacy of consideration is not then, of itself, a distinct principle of relief in Equity. The Common Law knows no such principle. The consideration more or less supports the contract. Common sense knows no such principle. The value of a thing is, what it will produce; and it admits of no precise standard. It must be in its nature fluctuating, and will depend upon ten thousand different circumstances.

> \* \* \* \* \* \*

> Still, however, there may be such unconscionableness or inadequacy in a bargain, as to demonstrate some gross imposition or undue influence; and in such cases Courts of Equity ought to interfere, upon the satisfactory ground of fraud. But then such unconscionableness or such inadequacy should be made out, as would, to use an expressive phrase, shock the conscience, and

**2.** An early statement of this view of the subjective and relative nature of value is Hobbes', in *The Leviathan:*
 The value of all things contracted for is measured by the Appetites of the Contractors; and therefore just value, is that which they be content to give.
*The Leviathan* (Pelican edition) Part I, Chp. 15, at 208 (Harmondsworth 1974).

amount in itself to conclusive and decisive evidence of fraud. And where there are other ingredients in the case of a suspicious nature, or peculiar relations between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud.

Story, *Commentaries on Equity Jurisprudence, supra,* §§ 244–246 (footnotes omitted).

A more recent statement of the principle is set forth in *Johnson v. Woodworth,* 134 A.D. 715, 119 N.Y.S. 146 (1909), a case in which the consideration for a deed by an elderly woman equaled 25% of the fair value of the property:

An arrangement so unusual and unnatural cannot be lightly regarded, without some explanation on the part of the person claiming the benefit thereof, and not much evidence is necessary to impose on such person the duty of an explanation. In 6 American and English Encyclopedia of Law, 701, it is said:

"When the inadequacy of consideration is very gross, fraud will be presumed; for though in such a case there may be no positive evidence of it, yet when the inequality is so great as to shock the conscience, the mind cannot resist the inference that the bargain must in some way have been improperly obtained. As to what degree of inequality constitutes gross inadequacy, no rule can be laid down. Between the parties, it has been said, 'to set aside a conveyance, there must be an inequality so strong, gross, and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it.'"

Substantially the same rule was declared in *Dunn v. Chambers,* 4 Barb. 376, and *Moyer v. Bloomingdale,* 38 App.Div. 227, 234, 56 N.Y.Supp. 991 [(1899)]. It is true that mere inadequacy of consideration is insufficient to avoid a sale; but that rule is not an unqualified one, and may not in all cases prevail where the inadequacy is very great. In *Byers v. Surget,* 19 How. 303, 15 L.Ed. 670 [(1856)], the court said:

"It is insisted that inadequacy of consideration, singly, cannot amount to proof of fraud. This position, however, is scarcely reconcilable with the qualification annexed to it by the courts, namely, unless such inadequacy be so gross as to shock the conscience; for this qualification implies necessarily the affirmation that, if the inadequacy be of a nature so gross as to shock the conscience, it will amount to proof of fraud."

The degree or extent of the inadequacy is to be considered with reference to the relations existing between the parties and the apparent reasons which may exist for such inadequacy. A consideration which may not be inadequate as between parties bound by the ties of affection and kinship may be grossly inadequate as between strangers, unless some explanation is vouchsafed....

*Id.* 119 N.Y.S. at 148–149.

Thus, while affirming as a general rule the position that, absent fraud or duress, the court will enforce the agreement reached (*e.g., Hajoca Corp. v. Security Trust Co.,* Del.Super., 25 A.2d 378 (1942)), American courts have continued the centuries old practice of inferring constructive fraud from shockingly oppressive contracts, at least when they could find sharp practice or overreaching present. Indeed the very language of Lord Hardwicke (in *Chesterfield v. Janssen,* 2 Ves.Sen. 155, 28 Eng.Rep. 82, 100 (1750)) quoted by Justice Story above was employed by the Delaware Supreme Court in 1978 to define an unconscionable contract:

The traditional test is this: a contract is unconscionable if it is "such as no man in his senses and not under a delusion would make on the one hand, and as no honest or fair man would accept on the other." *Williams v. Walker–Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 320, 350 F.2d 445, 450, 18 ALR 3rd 1297, 1301–3 (1965). "It is generally held that the unconscionability test involves the question of whether the provision amounts to a taking of an unfair advantage by one party over the other." *J.A.*

*Jones Construction Co. v. City of Dover*, Del.Super., 372 A.2d 540, 552 (1977). *Tulowitzki v. Atlantic Richfield Co.*, Del. Supr., 396 A.2d 956, 960 (1978).

Limiting our search to real estate contracts and to cases arising over the last fifty-years, without being exhaustive, we locate the following cases in which courts have set aside or refused to enforce conveyances because of the unfairness of price and other circumstances of inequitable or oppressive conduct. *Vockner v. Erickson*, Alaska Supr., 712 P.2d 379 (Ct.App.1986); *Daniels v. Forston*, 265 Ky. 81, 95 S.W.2d 1075 (1936); *Majewski v. Gallina*, 17 Ill.2d 92, 160 N.E.2d 783, 790 (1959); *Elsasser v. Miller*, Ill.Supr., 49 N.E.2d 21 (1943); *Lampley v. Pertuit*, Miss.Supr., 199 So.2d 452 (1967); *Graff v. Holliday*, 172 Okl. 503, 45 P.2d 1065 (1935); *Dreyer v. Dreyer*, 48 Or.App. 801, 617 P.2d 955 (1980); *Teats v. Anderson*, 358 Pa. 523, 58 A.2d 31 (1948); *Tetlow v. Rust*, 227 Pa. 292, 76 A. 22 (1910); *McKinnon v. Benedict*, 38 Wis.2d 607, 157 N.W.2d 665 (1968).

These cases give a flavor for the application of this judicial nullification of contract. *Lampley v. Pertuit*, Miss.Supr., 199 So.2d 452 (1967), for example, involved an alleged sale of a house, valued in excess of $1600, for $400. While plaintiffs had given a deed absolute, they testified that they had intended a loan not a sale and had intended the deed as security. In canceling the deed, the court concluded that the parties must have entered a loan transaction, reasoning that, a $400 purchase price would represent "grossly inadequate" consideration for the plaintiffs' house. The court gave weight to the trial court's finding that the defendant had a far superior education and understanding of the intricacies of real estate transactions than the plaintiffs. *Id.* at 454.

Another apt case is, *Daniels v. Forston*, 265 Ky. 81, 95 S.W.2d 1075 (1936). Plaintiff, a sixty-four year old woman, had fallen behind in her mortgage payments on her house. Her young cousin allegedly offered to lend her the necessary funds to pay off the mortgage. When she met with the young man and his attorney, however, she signed a deed of sale reserving to herself only a life estate in the property. Although the court found no direct evidence of duress or fraud, it did find the sale transaction to be unconscionable, since the market value for the house was far in excess of the small consideration paid. The court reasoned, in part, that no mutual agreement could have been reached since "this trusting old woman thought she was executing a mortgage; this scheming young man knew he was getting a deed." *Id.*, 95 S.W.2d at 1076.

Statutory developments over the last thirty years reflect an explicit legislative endorsement of this ancient equitable doctrine. The most important example of this mid-twentieth century codification is the unconscionability provision contained in Section 2–302 of the Uniform Commercial Code. That provision has, of course, been adopted in almost all of the states and applies to sale of all goods. Section 2–302 provides, in part:

> (1) If the court as a matter of law finds the contract or any clause ... to have been unconscionable [when] ... made the court may refuse to enforce the contract. ...

6 *Del.C.* § 2–302 (Michie 1975). The drafters' comments note that "the basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *Id.*

While the UCC does not, of course, apply to sales of land, there is good reason to assume that the legislature's solicitude for parties who are disadvantaged by bargains that are unconscionably oppressive should not be entirely ignored where sales of land are concerned. Such transactions are obviously enormously more significant than a purchase of goods to the average person. They will occur rarely in the typical life and will often involve a person's largest single asset. *See* Leff, *Unconscionability and*

*the Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485, 537 (1967).[3]

Indeed traditionally the common law has been more protective of grantors of real property than of commercial bargainers. Thus, in discussing the general rule that the court will not generally evaluate the adequacy of consideration, Justice Story long-ago quoted a civil law scholar who touched on the special case of land sales:

> [F]or the most part, [civil law jurists] seem silently to abandon cases of inadequacy in bargains, where there is no fraud, to the forum of conscience, and morals, and religion. Thus, Domat, after remarking, that the law of nature obliges us not to take advantage of necessities of the seller, to buy at too low a price, adds, "But because of the difficulties in fixing the just price of things, and of the inconveniences, which would be too many and too great, if all sales were annulled, in which the things were not sold at their just value, *the laws connive at the injustice of buyers, except in the sale of lands, where the price given for them is less than half of their just value."* So that sales of personal property are usually without redress; and even sales of immovable property are in the same predicament, unless the inadequacy of price amounts to one half the value; a rule purely artificial, and which must leave behind it many cases of gross hardship, and unconscionable advantage.

Story, *Commentary on Equity Jurisprudence, supra,* § 247. (emphasis added). The common law system has always regarded land as an asset of special significance. It is not surprising therefore to find echoes of the old civil law rule referred to above reverberating in contemporary American law. For example, it is a common practice for courts today to refuse to confirm judicial sales of realty in which the price is less than 50% of the fair market value of the land. *See, e.g., Girard Trust Bank v. Castle Apartments, Inc.,* Del.Super., 379 A.2d 1144 (1977).

Thus, while the statutory provision of UCC Section 2–302 does not itself reach sales of land, it is appropriate to read that statute as consistent with and reflective of the traditional equitable doctrines quoted above.

\* \* \*

One structure within which the common law has sanctioned courts in evaluating the fairness of an exchange is presented by the law of unilateral mistake. As our Supreme Court has recently restated that doctrine, it provides that:

> Generally, a party may rescind an agreement based on its unilateral mistake if the following conditions are met: (1) the enforcement of the agreement would be unconscionable; (2) the mistake relates to the substance of the consideration; (3) the mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place the other party in the status quo. 13 *Williston on Contracts* § 1573 (3d ed. 1970).

*In the Matter of the Appraisal of Enstar Corporation,* Del.Supr., 604 A.2d 404, 411 (1992). This structure has been employed in land sale cases. *See, e.g., Cummings v. Dusenbury,* 129 Ill.App.3d 338, 84 Ill.Dec. 615, 472 N.E.2d 575 (1984) (rescission of completed transfer); *Russo v. Friscia,* 15 A.D.2d 516, 222 N.Y.S.2d 595 (1961).

■ Arguably Professor Williston's formulation of this unilateral mistake doctrine forms one available structure for addressing the issues of this case.[4]

---

**3.** "... real property is likely to be the only thing that relatively unsophisticated people have which is worth tricking them out of ... the equity cases are replete with factual patterns involving the old being bilked and farmers sweet-talked into ruinous trades." 115 U.Pa. L.Rev. at 536.

**4.** But arguably this analytical structure which focuses importantly upon the plaintiff (due care) as well as upon the oppressiveness of the contract and the ability to save the defendant from harm is not very well suited to this type of case. The Delaware Supreme Court did not rely upon it in a case involving an allegedly unconscionable contract. The presence of a due care element in this test is problematic in a case in which a contract found to be unconscionable is brought about by the active agency of the party benefitted by the unconscionable bargain. The early unconscionability cases do not appear to focus on the prudence of plaintiffs. *See* note 7 *infra.*

1. *The transaction was unconscionable.*
(a) *The substance:* the financial aspects of the sale are shocking. Mr. Ryan had lived for more than 13 years in this modest house and had until relatively shortly before the sale regularly made his mortgage payment. The house had a fair market value of $19,800 and a mortgage of about $7,800.00. Thus, at the time it represented some $12,000 of equity which, one can safely assume, represented all of the assets that Ryan had acquired over a long life as an employed laborer.

In exchange for the conveyance of this asset, Ryan received no cash, and no release of liability.[5] He received only a promise to be able to occupy the same house at a market-rate rent. That rent was, at first, modestly in excess of the mortgage payment ($100) but within 15 months it had been raised twice, first to $160 (60% increase) then to $260 per month (additional 62% increase). *See* p. 1380 (table) above.

What, on the other hand, did Mr. Weiner get from the transaction and what did he give? He received, of course, the value of the property net of the mortgage. He paid out some cash (about $1,900) but that amount, in large measure, reduced the amount of the mortgage lien on the property and thus immediately accrued to the financial interest, not of Ryan, but of the new equity owner—Weiner himself. Therefore if the transaction is valid all that Weiner extended as consideration to Ryan was the right to be a tenant in his house at a fair market rate in excess of the mortgage amortization cost.

From a financial perspective this transaction is as close to a gift as one is likely to encounter.

(b) *The process:* the process that lead to this one-sided bargain, in part, appears to explain and account for it. Ryan was, of course, vulnerable, and unsophisticated, but those facts do not prevent him from making valid contracts. But Ryan's circumstances—his age, his obvious lack of sophistication, his poverty, his distress and his fear of being dispossessed—are factors that one who initiates a transaction concerning transfer of the other's home should take into account, in order to offer some assurance that whatever deal may be made is made knowingly and with due consideration.[6] But instead of offering Ryan sufficient time to consider his proposal (and to perhaps consult with others), Mr. Weiner moved with urgent speed. He did not give Ryan time to consider the matter, perhaps to seek advice from a Legal Aid lawyer or to consider alternatives. Weiner rushed Ryan. He picked him up at his home early the next day and took Ryan to Weiner's lawyer to sign papers. I am convinced that Ryan did not understand the nature and effect of the papers he signed.

2. *Ryan's mistake relates to the substance of the consideration.* He misunderstood the very nature of the transaction. Ryan believed he was giving security for a loan; that Weiner would manage the property and that Ryan would only have to pay a monthly amount that would cover the mortgage and, in time, repay Weiner. In this, the documents show he was mistaken.

3. *Ryan was not culpable.* The third item in Professor Williston's statement of a

---

**5.** The default judgment entered against him in the foreclosure action was never satisfied.

**6.** The law has recognized that a special form of pressure may be asserted by one who comes to another's home to induce a commercial transaction. In particular, under the Federal Trade Commission Act, the FTC has promulgated regulations with respect to the door-to-door sale of consumer goods. *See* 16 C.F.R. § 149.1, *cited in* 1B Coogan, Hogan, Vagts and McDonnell, *Secured Transactions under the Uniform Commercial Code* § 20E.06[2] (Bender 1990).

Pursuant to the regulation, a door-to-door solicitor commits an unfair or deceptive act when,

upon reaching an agreement with a consumer, he or she fails to provide a *fully completed receipt* or copy of a sale contract which is written in *language principally used during the sales pitch.* The contract must also contain the solicitor's name and address and a prescribed bold-faced statement *that the consumer may cancel the transaction at any time prior to midnight of the third business day after the date* of the transaction. 16 C.F.R. § 429.1(a). The regulation also requires that a solicitor orally inform a consumer of the right of cancellation at the time that the contract is signed.

unilateral mistake test as recited by our Supreme Court is whether the party who was mistaken exercised ordinary care. I take this element of the structure of inquiry to direct our attention to the question who, if either party, is most responsible for the material mistake. The justification for this element, in the context of an unconscionable contract, is not readily apparent at least where the party benefitting from the contract is actively involved in securing the unconscionable term.[7] Presumably it is grounded in a perception of fairness to the beneficiary of unconscionable contracts. That is, if the result of the analysis may be to deprive the defendant of the benefit of the bargain he thought was reached, then it may be thought that in fairness to him, even if in all events he will at least be restored to his prior position, this result ought not obtain if plaintiff is more responsible for the mistake than was he. On this formulation, I understand this element, in the context of an unconscionable contract, to permit a comparative assessment of fault.[8]

 It is hard to say that Ryan exercised ordinary care of a prudent man in entering this transaction. He did not understand the transaction and appears to have naively placed himself entirely into Mr. Weiner's hands. But while Ryan appears as a financial innocent upon whom Mr. Weiner could practice his skills, Weiner appears a manipulative and skillful predator. When one with substantially greater knowledge, experience, and resources himself seeks out the powerless to deal with them directly on matters of vital importance, he assumes some responsibility to assure, to the extent circumstances permit, that they do understand the nature of the

transaction proposed. If he does not do this and if the transaction he initiates is oppressive and shockingly one-sided, he cannot retain the bargain. Even if Weiner did not affirmatively deceive Mr. Ryan (as to which I make no finding), he did not assure that the party from whom he attempted to extract so much understood the nature of this transaction. It was this fact more than Ryan's lack of care that accounts for Mr. Ryan's unilateral mistake of thinking he was signing a secured loan.

4. *It is possible to restore the status quo.* On one level, the transaction was entirely financial. Ryan never moved out of his house. The mortgage was not paid off by Mr. Weiner; rather he made monthly payments from the payments that Ryan made to him. Thus it is not difficult to return the parties to the status quo as of May, 1984. All that is required is for Mr. Weiner to establish what he paid on account of the house: mortgage, taxes, insurance, heat, utilities and maintenance. These amounts, including the expenditures necessary to bring the mortgage up to date in May 1984 appear to total $12,149.27. They will be credited to him. On the other hand the $21,480.00 paid by Mr. Ryan to Mr. Weiner should be credited to him. After this operation is gone through (and tax adjusted) a net amount will be owing to Mr. Ryan. Interest is a matter upon which the parties should be heard, if they cannot resolve it. Surely Mr. Weiner is entitled to a fair rate of interest on any amounts of credit that he had extended, for so long as he was a net lender into the transaction. It is, however, not clear in the record how long a time passed before all net expenditures were fully recovered from "rental" payments in excess of mortgage payments.

7. One might (indeed I do) think that Professor Williston's formulation is unduly strict if applied to unconscionable contracts in which the beneficiary of the bargain is guilty of overreaching, pressuring or otherwise actively taking advantage of the other person. In our research, we find in the early English cases (*see, e.g., Bowes v. Heaps,* 3 V. & B. 118, 35 Engl.Rep. 423 (1814); *Gartside v. Isherwood,* 1 Bro.C.C. 558, 28 Eng.Rep. 1297 (1783); *Clarkson v. Hanway,* 2 P.Wms. 203, 24 Engl.Rep. 700 (1723)) and in the early American cases (*see, e.g., Garrow v. Brown,* N.C.Supr., 86 Am.Dec. 450 (1864);

*Burch v. Smith,* 15 Tex. 219, 65 Am.Dec. 154 (1855); *Juzan v. Toulmin,* 9 Ala. 662, 44 Am. Dec. 448 (1846), many instances in which relief from an unconscionable contract is afforded without any inquiry into the due care of the oppressed party). *See also* 1 *Restatement of Law 2d Contracts* § 153(a) (1981).

8. *Cf.* 64 Del.Laws Ch. 384 (1984) (adopting comparative negligence rule as policy of this jurisdiction. 10 *Del.C.* § 8132).

Counsel can work out those details. The significant point is that there is no factor that would preclude the entry of an order that will return defendant, financially speaking, to the position he occupied when he went to Mr. Ryan's home to induce a transaction.

\* \* \*

■ Thus I conclude that this transaction is one that, under principles applied for more than two hundred years, cannot in equity be allowed to stand.[9] I conclude that it involves shockingly unconscionable financial terms, coupled with innocent failure to understand the transaction on one side and sharp and predatory practices on the other. I am satisfied that these facts clearly are the equivalent of cases in which courts have set aside land transfers as fraudulent or constructively fraudulent.

The plaintiff may submit a form of order consistent with the foregoing, on notice.

---

9. I accept the evidence that Ryan has only recently realized that he sold his house absolutely to Norman Weiner in 1984 and that he has proceeded promptly thereafter to adjudicate his rights. More importantly I cannot conclude that any delay in asserting this claim has substantially prejudiced Mr. Weiner. He has made no such claim with respect to his defense of this lawsuit and with respect to his financial position, the rescission to be afforded to plaintiff contemplates that defendant will be restored to the May 1984 status quo financially. Thus, I find no detriment to defendant from the passage of time.