CROWDER CONSTR. CO. v. KISER, 1998 NCBC 2

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

CROWDER CONSTRUCTION
COMPANY,

        Plaintiff,

        v.

EUGENE P. KISER,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
95 CVS 14097

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER AND OPINION**

{1} This matter is before the Court on Plaintiff Crowder Construction Company's Motion for Summary Judgment. For the reasons set forth below, the motion is granted.

> *William C. Livingston and Russell F. Sizemore of Kennedy, Covington, Lobdell and Hickman, Attorneys for Plaintiff.*

> *James B. Gatehouse and C. Richard Rayburn, Jr. of Rayburn, Moon and Smith, P.A., Attorneys for Defendant.*

## FACTUAL BACKGROUND

{2} This case presents unique issues with respect to the enforcement of sell-back provisions in stock purchase agreements entered into between private, closely held companies and their employees. Defendant Eugene P. Kiser (Kiser) was the Chief Financial Officer of Plaintiff Crowder Construction Company ("the Company") and one of the officers responsible for the creation and design of its stock purchase agreement with its employees. Upon termination of his employment by the Company, Kiser started a construction company of his own and refused to sell his shares to the Company as called for in the stock purchase agreement. The Company seeks specific performance of that agreement.

{3} Kiser does not contest the validity of stock purchase agreements which require employees of privately held companies to sell their stock back to their employer upon termination of their employment. He seeks to avoid enforcement of his particular obligation to do so on a number of grounds, each of which will be addressed separately.

{4} There are a number of underlying undisputed facts which provide a background to this dispute and are pertinent to the specific issues raised by Kiser.

{5} The Company was founded in the late 1940s by two brothers, O.P. Crowder and W.T. Crowder, Sr. It was incorporated in 1953, and as early as 1955, the Company entered into its first agreement with its stockholders governing the ownership and repurchase of stock from employees and stockholders ("the Shareholders' Agreement"). The Company has always been a closely held corporation with the majority of the stock owned by members of the Crowder family. As far as this record discloses, only persons employed by the Company are presently or have ever been allowed to retain stock ownership in the Company. The Company is currently run by Otis A. Crowder and Bill Crowder, sons of the two founders.

{6} Kiser was hired by the Company in 1981 as its controller. He was subsequently promoted to Chief Financial Officer and held the offices of Vice President of Finance and Corporate Secretary. He held the latter positions from approximately 1986 until his termination in January of 1995. He was a member of the Board of Directors of the Company and served on the Executive Committee of the Board of Directors.

{7} The Company was primarily engaged in heavy highway construction. Construction companies are subject to significant swings in their profitability as a result of the nature of the construction business. Also, highway construction is heavily influenced by government spending. As a result, profitability of such companies can be both cyclical and volatile. After Kiser joined the Company, the original founders had less to do with the management of the Company, and other officers, including Kiser and Ed Tucker, began to assume more management responsibilities along with Otis Crowder and Bill Crowder.

{8} In 1986, the Company adopted a stock option plan ("the 1986 Plan"). Although the parties disagree on the exact responsibilities Kiser had in connection with the creation of that plan, it is undisputed that he was one of the officers of the Company charged with creating the 1986 Plan. The 1986 Plan was created with the assistance of the Company's outside accountants and outside legal counsel. The Company's existing Shareholders' Agreement was amended to incorporate the provisions of the 1986 Plan.

{9} The 1986 Plan permitted a group of key employees (which included Kiser) to purchase stock in the Company at a purchase price of $7.00 per share. At that time, the full book value of the stock was $31.83 per share.

{10} The 1986 Plan and the amended Shareholders' Agreement required terminated employees to resell their shares to the Company upon termination. In connection with adoption of the 1986 Plan, management rejected suggestions to use fair market value rather than book value to determine the resale price. Management, including Kiser, were well aware that the Company's book value per share was substantially less than its fair market value per share at that time. The purchase price received by a departing employee who had acquired stock under the 1986 option depended upon two things: (a) the period of time which had elapsed since the stock was issued, and (b) the change in book value from $31.83 per share. The Shareholders' Agreement gave those employees purchasing stock in 1986 a stake in the future profitability of the Company by adjusting the repurchase price by either adding the amount by which the book value per share had increased or subtracting the amount by which it had decreased since the stock was issued. This adjustment was made without regard to length of employment.

{11} As an additional feature designed to encourage employees to remain at the Company, the Shareholders' Agreement provided that if the stock had been issued for more than seven years, the repurchase price for the stock would be one hundred percent of the book value of the stock or $31.83 per share plus or minus the adjustment described above. If the employee had not completed seven years' service, the purchase price was $7.00 per share plus or minus the adjustment described above. For example, if an employee remained at the Company for seven years and the book value of the stock did not change, the employee would receive $31.83 a share rather than the original purchase price of $7.00 a share. Kiser signed the amended Shareholders' Agreement in 1986 and purchased two thousand shares of stock under the 1986 Plan for $7.00 per share for a total investment of $14,000.

{12} In 1988, Kiser, Dean Dearman, and Ed Tucker were permitted to purchase stock again. Kiser also participated in the development of this stock option plan. The 1988 stock option plan ("the 1988 Plan") was patterned after the 1986 Plan. The discounted employee purchase price remained at $7.00 per share; however, the book value of the stock at that time had risen to $44.83 a share, thus providing a greater discount for the three employees who purchased stock under the 1988 Plan. Kiser exercised all of his rights under the 1988 Plan and purchased 4,750 shares. Thus, at the end of 1988, he was the owner of 6,750 shares, or approximately six percent of the stock of the Company, and had invested $47,250.

{13} The 1988 Plan again required amendment of the Shareholders' Agreement. Prior to 1988, the Shareholders' Agreement had used "book value" to determine the repurchase price. The 1988 version of

the Shareholders' Agreement introduced the concept of "adjusted book value" for the first time. The repurchase price was changed from book value to adjusted book value because the corporation had changed its tax status from a C corporation to a Subchapter S corporation. As a Subchapter S corporation, the Company's shareholders would be taxed directly on the Company's profits. Accordingly, the Company followed the practice of making distributions to the shareholders to enable them to pay that tax. Counsel for the Company testified that the concept of adjusted book value was added to the Shareholders' Agreement in order to take into account the tax liability and the distributions which the Company would make to shareholders under this Subchapter S status. (Johnson Dep. at 32-34.) Also, Section 6.1 of the 1988 Shareholders' Agreement amended previous similar provisions to give the Company's accountant authority and discretion to determine the adjusted book value in order to accommodate any special accounting methods or necessary timing adjustments. (Johnson Dep. at 35-36.)

{14} In 1990, another stock option plan was adopted. Kiser did not purchase stock under that stock option plan. However, the adoption of the 1990 stock option plan resulted in a new amended Shareholders' Agreement dated March 21, 1991, which superseded all of the previous shareholders agreements. That is the document which controls the issues raised in this lawsuit.

{15} In the late 1980s and early 1990s, the Company was simultaneously going through a transition in management and difficult economic times. It is undisputed that significant differences existed in personality and management style between Otis Crowder and Eugene Kiser. Kiser's counsel describes the Company meetings as containing "ongoing and often rancorous debate." (Kiser Br. at 7.) Kiser and Otis Crowder disagreed on many significant management issues. Kiser concedes that he was openly critical of Otis Crowder both inside and outside the Company. (Kiser Dep. at 128-30.) It is clear and undisputed on this record that Otis Crowder and Eugene Kiser had developed an acrimonious relationship by the end of 1994. The transition in management caused strains on other relationships within management, and the Company hired a psychologist specializing in management relationship, Dr. John Young, to help Otis and Bill Crowder deal with issues involving management relationships. In May 1994, the Company paid for Kiser to go on a management retreat in Ireland with Dr. Young to help Kiser develop a less confrontational management style.

{16} In the fall of 1994, the Company brought in an outside management consultant to help with its financial problems. Kiser was openly critical of at least some of the outside consultant's recommendations. A management retreat was held in November 1994 to address the critical issues facing the Company. The differences between the Crowders and Kiser in personality and business philosophy persisted. The outside consultant subsequently expressed an opinion that Kiser should be terminated. Between the November 1994 management retreat and a follow-up retreat scheduled for the end of January 1995, the decision was made to terminate Kiser. Otis Crowder reached the decision in conjunction with Bill Crowder, after consulting with W.T. Crowder, Sr., and Dr. Young. Kiser's employment was terminated on January 23, 1995, and on February 3, 1995, he was formally removed from his corporate offices of Vice President and Secretary by vote of the Board of Directors.

{17} It is clear and undisputed on this record that a poor working relationship existed between Kiser and the Crowders and that neither side fully trusted or respected the other. This unhealthy working relationship between key managers existed at a time when the Company was also stressed financially and was called upon to make fundamental strategic decisions which would impact its future operation.

{18} The impact of Kiser's termination on his rights under the various stock option plans and the Shareholders' Agreement is clear. The 2,000 shares issued pursuant to the 1986 Plan were fully vested since Kiser had held the stock for the full seven years called for under the plan. Under the Shareholders' Agreement, he was entitled to receive the full adjusted book value for all 2,000 shares. The Company calculated adjusted book value to be $56.42 per share for a total payment of $112,840. Kiser thus realized a profit of $98,840 on his original $14,000 investment in 1986.

{19} However, at the time of his termination, Kiser had not held the 4,750 shares issued pursuant to the

1988 Plan for the full seven years. Accordingly, he received only the initial purchase price of $7.00 per share plus the amount by which the adjusted book value of the stock had appreciated since 1988. The Company calculated his total payoff under the 1988 stock option plan to be $88,302.50, of which $55,052.50 constituted profit on the investment.

{20} In total, Kiser is entitled to receive $201,142.50 under the Shareholders' Agreement for the stock for which he had paid $47,250. However, it is undisputed that had he remained in the employ of the Company for another seven to eight months, he would have received an additional $180,000 for his 1988 stock based upon his completion of the seven-year holding period and the accountants' determination of adjusted book value.

{21} One other development is pertinent to the Court's decision. Accepting Kiser's version of the facts as true for purposes of this motion, when the 1986 Plan was adopted, the Company and the purchasing shareholders had been advised by the Company's accounting firm that the shareholder/employees would not incur any tax liability with respect to the stock options bargain element (the difference between the repurchase price and the per-share book value at the time of the initial purchase) until the stock was sold. In the middle of 1994, the accounting firm told the Company and the shareholders that the shareholders were required to pay taxes on the bargain element of the stock options as they completed the seven-year holding period and became completely vested in their stock options. In Kiser's view, this was a change in position, and he vigorously disagreed with the accountants' advice. This advice was amended to provide that the shareholder tax liability would occur only if the Company took a tax deduction for the bargain element in the repurchase price in the year in which full vesting occurred. The Crowders were interested in the Company's taking advantage of that deduction. In Kiser's case, this meant that he incurred a tax liability when he completed the seven-year holding period in 1993 with respect to the 2,000 shares he purchased under the 1986 Plan. Since he did not know of his tax liability until 1994, he was required to file an amended tax return showing the income.

{22} The problem created by this change in tax liability was that the shareholders incurred a tax liability for the increased value of their stock without receiving any cash to pay the tax. Rather than deferring the tax on the gain until the stock was sold, the tax came due when the increased value became fully vested at the end of seven years, regardless of whether or not the stock had been sold.

{23} The Company could have tried to compensate the shareholder/employees for this tax liability in some way, for example, by dividends or increased income. It could have simply paid the tax on behalf of the shareholders. Or it could elect not to compensate the shareholder/employees for the acceleration of their tax liability.

{24} Kiser was a staunch advocate of the Company's somehow paying the tax liability or compensating the employees for its acceleration. Kiser told Otis Crowder he felt that if the Company chose not to pay the tax or otherwise compensate the shareholders for the acceleration of the tax liability, such action would be unfair and reflect greed on the part of the non-option shareholders (members of the Crowder family). Prior to Kiser's termination, a special shareholders' meeting had been called to discuss the issue. Kiser had indicated to Otis Crowder that he would articulate his views at that meeting. Kiser was terminated before the meeting took place.

{25} Subsequent to Kiser's termination, the Company elected to make loans to its shareholders (except for Kiser) to cover the tax liability.

{26} Had Kiser resold his stock to the Company as required by the stock purchase agreement, this tax liability without cash would not have occurred in his case. He would have received some cash for his stock at the time the tax was due and not had what he referred to as "phantom" income. The loans made by the Company to other shareholders had the effect of deferring payment of the tax liability out of the shareholders' assets until such time as the promissory notes became due when the stock was repurchased.

{27} Upon termination of Kiser's employment in January 1995, the Company sought to repurchase his

stock and tendered to him the amounts due under the Shareholders' Agreement based upon the adjusted book value calculated for the fiscal year ending March 31, 1994. The Company made the original calculation, but subsequently engaged the Company's accounting firm to review the determination. Kiser has acknowledged that no Subchapter $\underline{S}$ distributions were made during 1994 and that he was not aware of any unusual accounting or timing issues that would require any adjustment to book value under the requirements of Section 6.1. (Kiser Dep. at 154-56.) Kiser was the Chief Financial Officer of the Company when the book value was calculated for the fiscal year ending March 31, 1994, and acknowledged that the Company's independent accounting firm, Deloitte & Touche, L.L.P., audited the Company books for the fiscal year ending March 31, 1994, to verify that book value had been calculated correctly in accordance with generally accepted accounting principles. (Kiser Dep. at 153-54.) During the course of this litigation, the Company asked Deloitte & Touche to review the Company's calculation with respect to the purchase price of Kiser's stock under the Shareholders' Agreement and determine if any adjustments needed to be made to the adjusted book value used by the Company in originally calculating the purchase price for Kiser's stock. Deloitte & Touche's report confirmed the accuracy of the purchase price tendered by the Company.

{28} During Kiser's tenure as Chief Financial Officer and Corporate Secretary, five employee/option holders were terminated (J.R. Wilson, Dean Dearman, Dan Goodall, V.H. Epps, and Don Hancock). As Chief Financial Officer, Kiser would have had the responsibility for ensuring that the repurchase of stock from these employees took place in accordance with the Shareholders' Agreement and that the repurchase price paid was accurate. In each instance, the adjusted book value was determined by the Company, and the only adjustments made to book value were to account for tax distributions made to shareholders because of the Company's Subchapter $\underline{S}$ status. In each case, the purchase price was calculated in the same fashion as Kiser's purchase price was subsequently calculated. At least one of the terminations, that of Dean Dearman, was, like Kiser's termination, involuntary. In each instance involving the repurchase of stock from terminated employees, no outside accountants were used to calculate adjusted book value.

## LEGAL ARGUMENT AND CONCLUSIONS

{29} Kiser asserts six separate reasons why the Shareholders' Agreement of 1991 should not be enforced by an order of specific performance. Each asserted reason falls in one of two categories: (a) an argument that the purchase price has been improperly calculated, or (b) an argument that it would be inequitable or unconscionable to enforce the agreement under the circumstances asserted. Each reason will be addressed separately; however, it is important that Kiser's arguments be viewed in the larger context of enforceability of shareholder/employee buy-sell agreements generally.

{30} Shareholder agreements with mandatory buy-sell provisions tied to continued employment are commonly used by closely held companies in North Carolina and other jurisdictions. Use of such agreements permits owners of closely held companies to provide their employees with an additional incentive (stock ownership) to further the growth and profitability of the company. It also helps retain key employees. The employees benefit by being able to participate in any increase in the worth of the company they help create. Such agreements generate greater interest in employees in the long-term success of the company. Properly and fairly used, they are salutary and beneficial tools for small businesses and their employees.

{31} The use of mandatory buy-sell provisions helps owners of small and closely held businesses to control the ownership of the business and thus facilitates and encourages the use of such agreements. See 1 F. Hodge O'Neal & Robert B. Thompson, O'Neal's Close Corporations § 7.02 (3d ed. 1987) [hereinafter Close Corporations], wherein it is stated:

> Each shareholder wants to be in a position to prevent outsiders from entering the business if he doubts their integrity or business judgment or feels that working with them would be unpleasant or unrewarding. Participants in a closely held corporation may want to restrict the transferability of shares in order to guard against the purchase of shares by competitors or

other persons unfriendly to the corporation. . . .

Whenever the shareholders' active participation in the business is necessary to its success, free transferability of shares is particularly undesirable. If a shareholder performs an essential task, the possibility that he may sell his shares to an outsider is a serious threat to the enterprise. A purchaser of shares may have neither the ability nor the desire to do the work previously performed by his vendor, or he may not be able to work congenially with the other participants. It is often unlikely that his personality and skills would harmonize with and complement those of the existing shareholders. Yet he would be entitled, incident to his share ownership, to a voice in management, a share in profits, and the right to examine corporate books and records.

A purchaser interested only in investment might also be a hazard to the enterprise, for there would be a great possibility of friction with the active shareholders. The active participants in all likelihood would not be willing to place on the payroll a shareholder who contributed nothing in return for his salary. They might well feel that the profits of the business were due largely or entirely to their own efforts and talents and would be opposed even to paying substantial dividends to a shareholder not actively contributing to the corporation's success . . . . The conflicts between the interests of the active and inactive shareholders may well lead to expensive litigation, unfavorable publicity, loss of customers, and impairment of the corporation's credit.

Id. at 4-5 (endnotes omitted).

{32} Without the ability to control transfer of stock, owners of small, closely held businesses would be less likely to offer stock to their employees. The use of mandatory buy-sell provisions also protects shareholder/employees. They ensure that a terminated employee can cash in his or her stock and thus receive the benefit. Closely held businesses do not have publicly traded stock, and thus there is often no market for a small minority interest in a closely held company. Mandatory buy-back provisions ensure that employees can sell their stock and not simply be stuck with a security which does not pay a dividend or have a market value.

{33} Particular closely held businesses may have a heightened interest in restricting the ownership of their stock. In this case, the Preamble to the 1991 Shareholders' Agreement specifically reflected such an interest and the reasons therefore. It provided:

Whereas, Shareholders recognize that the construction business is speculative and frequently involves the exposing of corporate assets to substantial risks, with the result being that it is felt to be in the best interest of the Corporation that the shares of stock in the Corporation be owned only by individuals who are employees of the Corporation . . . .

{34} Mandatory buy-sell provisions have been upheld in North Carolina. See Lacy J. Miller Mach. Co. v. Miller, 58 N.C. App. 300, 293 S.E.2d 622, disc. rev. denied, 306 N.C. 743, 295 S.E.2d 478 (1982).

{35} As previously noted, most of the companies using mandatory buy-sell provisions in stock purchase agreements are closely held companies. The stock, particularly a minority interest, is not readily marketable and is frequently subject to discount because of its lack of marketability and the fact that small closely held companies are less likely to pay dividends or may pay smaller dividends than comparable publicly traded companies. Without a readily available market, it is often difficult to determine a fair market value. Determinations of fair value become more subjective. Closely held and small companies are also concerned about costs; therefore, they have an interest in keeping the stock purchase agreement simple and inexpensive to administer. It is not surprising that "book value" is the most frequently used method to set the transfer price of shares subject to mandatory buy-sell provisions . See Close Corporations § 7.30. Book value is simple. It can be determined inexpensively from existing records and is determined annually by simple reference to the balance sheet of the company. No outside consultants

are required to render sometimes subjective opinions on fair value, discounts for lack of marketability, or proper methods of evaluation. Use of book value provides more certainty at less cost than most other methods. It is also a more stable method of evaluation for companies in cyclical industries, such as construction, where the profits and/or losses can vary widely from year to year making market valuation at a single point in time less reliable and more arbitrary.

## A. DID THE COMPANY PROPERLY DETERMINE THE PURCHASE PRICE UNDER THE SHAREHOLDERS' AGREEMENT?

{36} Under Sections 3.1 C and D of the Shareholders' Agreement, the Company is obligated to repurchase Kiser's shares at a price based upon their adjusted book value. Section 6.1 of the Shareholders' Agreement defines "adjusted book value" as follows:

> 6.1 Adjusted Book Value: Adjusted book value of the shares of stock of the Corporation for purposes of this agreement shall be defined as the net book value as adjusted as described herein of the shares of stock as of the end of the last fiscal year prior to the death, disability, termination of employment, or offer to sell. The adjusted book value shall be determined by the certified public accountant then servicing the Corporation. In determining the adjusted book value, the certified public accountant shall make any adjustments that may be required to fairly represent the book value of the Corporation, such as adjustments required to reflect funds that need to be distributed to cover the stockholders' tax liability resulting from the Sub S distribution of income, the Corporation's use of the completed contract or percentage of completion method of accounting, or the use of LIFO or FIFO accounting or similar timing adjustments. In no event shall the adjusted book value of the Corporation (for the purposes of buying the shares of the Shareholder) include insurance proceeds on the life or disability of the Shareholder whose stock is to be redeemed.

{37} The Company contends that it is entitled to repurchase Kiser's stock for the total sum of $201,142.50, to be paid by cash in the amount of $47,355 and a promissory note in the amount of $153,788 payable in seven equal annual installments of $21,969.71 per year. The Company originally made that calculation of adjusted book value on its own. After this lawsuit was filed, Deloitte & Touche, the Company's certified public accountant, reviewed the Company's calculations and determined that the Company's calculation of adjusted book value was correct.

{38} Kiser contends that the adjusted book value of his shares is $540,000 and that both the Company and Deloitte & Touche have improperly calculated adjusted book value as required by Section 6.1 of the Shareholders' Agreement.

{39} This Court concludes that the adjusted book value calculated by the Company and Deloitte & Touche is correct and binding on Kiser and that the Company has tendered the proper amount to Kiser under the Shareholders' Agreement.

{40} First, the Court concludes that the determination of the certified public accountant then servicing the corporation, in this case Deloitte & Touche, is controlling on the Company and the shareholder, provided that the certified public accountants have followed generally accepted accounting principles and have not made any plain and obvious errors, such as mathematical miscalculations.

{41} Second, the Court has concluded that in determining adjusted book value, the Company and its accountants did not violate the contract by using the book value of equipment based upon the normal depreciation schedule used by the Company and not adjusting that book value for the fair market value of the equipment.

{42} In reaching these conclusions, the Court has relied upon the language of the contract itself, the

undisputed facts concerning the context in which the language was inserted into the agreement, and the undisputed facts with respect to past interpretations of the contract language by both the Company and Kiser.

{43} It is undisputed that Section 6.1 and the entire concept of "adjusted book value" was inserted into the Shareholders' Agreement following the decision of the Company to elect Subchapter S status for tax purposes. The effect of that change was to tax the shareholders directly on the corporation's profit. Accordingly, the Company would make distributions to shareholders to enable them to pay the tax. The concept of adjusted book value was necessarily added to the Shareholders' Agreement to take into account the tax liability and the distributions which the Company would make to shareholders. With the possibility of "adjustments" being required as a result of the Subchapter S election, the Company's accountant was given the authority and discretion to determine the adjustments "in order to accommodate any special accounting methods or necessary timing adjustments." (Johnson Dep. at 35-36.)

{44} The language of Section 6.1 itself requires the accountant to make "any adjustments that may be required to fairly represent the book value of the Corporation." (Emphasis added.) The language goes on to specifically mention the distributions to cover a shareholder's liability resulting from the Subchapter S election, the use of the completed contract or percentage of completion method of accounting, or the use of LIFO or FIFO accounting and "similar timing adjustments." Thus, neither the language itself nor the history of the insertion of Section 6.1 into the Shareholders' Agreement suggests that the parties to the Shareholders' Agreement intended to change the manner of determining the book value of the equipment of the corporation when the agreement was amended in 1988.

{45} Kiser relies on the affidavit of his expert, Ernest L. Ten Eyck, to support his argument that the Company and Deloitte & Touche have not made "timing" adjustments to "fairly represent the book value of the Corporation." The principal adjustment Ten Eyck urges is an upward adjustment in the amount of $5,109,906 to "reflect overdepreciation of Crowder's equipment." Ten Eyck's conclusion that the equipment has been overdepreciated is based upon his review of a 1994 Prequalification Application submitted by the Company to the Virginia Department of Transportation. The application shows that the "actual market value" of Crowder's machinery and equipment exceeded its "book value" by $5,677,673. In effect, Ten Eyck's calculation substitutes market value of the machinery and equipment for book value of the machinery and equipment, an adjustment the Court concludes is not warranted by the language of the agreement.

{46} The Company has been consistent in its application of the determination of book value, particularly with respect to the machinery and equipment. Between 1990 and the date of Kiser's employment, it is undisputed that five shareholders left the employ of the Company and sold their stock to the Company pursuant to the terms of the Shareholders' Agreement. Kiser was the Chief Financial Officer and Corporate Secretary at the time of each of those transactions. In each case, no adjustment was made to the book value figure on the books to reflect fair market value or the use of any other depreciation schedule. The purchase price in each case was calculated in the same manner as Kiser's purchase price was calculated in 1995. It is significant that in each of the other cases, the Company calculated the adjusted book value and did not incur the cost of outside accountants to determine if any adjustments were necessary. Thus, it is clear on this record that Kiser has been treated the same as other shareholders who left the employment of the Company while Kiser was the Chief Financial Officer, Corporate Secretary, and a Director. It is also significant that no issue has been raised on this record with respect to the depreciation method used by the Company. Indeed, Kiser, as Chief Financial officer of the Company, would have been primarily responsible for the determination of the depreciation methods used by the Company. Kiser's expert does not contest the use of the Company's depreciation schedules; nor is there any evidence that the schedules were not in accordance with generally accepted accounting practices; nor is there any evidence in the record that the depreciation schedules were adopted for the purpose of impacting book value under the terms of the Shareholders' Agreement. Had that occurred, Kiser would have been in the best position of anyone to know it. As far as the record in this case is concerned, the depreciation schedules used by the Company for its machinery and equipment were reasonable, within

generally accepted accounting practices, and not adopted for any ulterior motive related to the Shareholders' Agreement. It is clear from this record that the depreciation schedules resulted in a difference between the book value of the equipment and its fair market value. Since book value is not an accounting concept designed to reflect fair market value, that is neither unusual nor unexpected. The adjustment to book value of the equipment requested by Kiser would result in a book value inconsistent with the normal and consistently applied accounting practices of the Company over a number of years. Depreciation schedules may be set for a variety of legitimate business reasons. There is no evidence on this record that the chosen depreciation method was selected for an illegitimate reason to lower book value for purposes of determining value under the Shareholders' Agreement, nor was it contrary to generally accepted accounting practices. Had the Company depreciated its equipment in the manner sought by Kiser, other components of book value would or could have been adversely effected over time. Where, as clearly appears here, book value of equipment is based upon normal depreciation methods that were selected for legitimate business reasons and there is no evidence they were selected to adversely effect the stock repurchase price, there is no reason to disturb the determination of book value of the equipment that was made based on those depreciation methods. To do otherwise would inject unreasonable uncertainty into the valuation method that would substantially reduce the appeal of stock purchase agreements to closely held companies. Accordingly, the court concludes that neither the Company nor Deloitte & Touche erred in calculating the book value of the equipment as called for in the Shareholders' Agreement.

{47} The second error in calculation of the book value asserted by Kiser relates to asphalt and repair parts inventories. Book value under the Shareholders' Agreement was to be determined for the fiscal year ending March 31, 1994. It is undisputed, and the Company acknowledges, that a complete physical inventory was performed in 1995 and that additional inventory was recognized at fiscal year ending March 31, 1995, over and above what had been recorded in the Company's books for the fiscal year ending March 31, 1994. Kiser's expert concluded that this additional inventory must have existed on March 31, 1994; estimated its value; and assumed that neither the Company nor Deloitte & Touche had taken this additional inventory into account in determining book value as of March 31, 1994. Accordingly, he added $221,000 to book value for repair parts inventory and $384,000 to book value for asphalt inventory. Based upon 113,900 shares outstanding, Kiser's expert would have adjusted the book value by $5.31 a share based upon the unrecorded asphalt and repair parts inventories. This would have made a difference of $35,842.50 in the book value calculation, assuming that the inclusion of this inventory would not have resulted in any other changes to the Company's balance sheet. The Company, on the other hand, introduced the affidavit of Ronald Edwards of Deloitte & Touche, which has not been refuted. That affidavit indicates that Deloitte & Touche, in its review to determine appropriate adjusted book value, took into account $683,000 of recycled asphalt inventory and equipment repair parts inventory which had not been previously recognized. At the same time, Deloitte & Touche determined that the normal asphalt inventory had been overstated by $753,000. Deloitte & Touche concluded that the two discoveries offset each other and declined to adjust the book value. Had an adjustment been made, it would have been to lower book value. (D. Ronald Edwards Aff. of Dec. 9, 1996, 6, 7, 8.) It is significant that there is no evidence or allegation in this case that the Company attempted to deceive its auditors by concealing assets to depress the stock price. Indeed, Kiser was the Chief Financial Officer on March 31, 1994. Thus, this case does not fall within the purview of Lacy J. Miller Mach. Co. v. Miller, 58 N.C. App. 300, 293 S.E.2d 622. The facts in the Edwards affidavit are undisputed. The Court concludes therefore that there has been no error in determination of the adjusted book value warranting a denial of equitable relief to the plaintiff.

{48} In summary, the Court concludes that there are no material disputed facts with respect to the correctness of the adjusted book value determined by the Company and Deloitte & Touche and that the price was correctly determined and binding on Kiser.

### B. IF THE ADJUSTED BOOK VALUE WAS CORRECTLY CALCULATED UNDER SECTION 6.1 OF THE SHAREHOLDERS' AGREEMENT, IS REQUIRING SALE OF KISER'S STOCK AT THAT PRICE UNCONSCIONABLE?

{49} Kiser argues that if the Company properly determined the repurchase price in accordance with

Section 6.1, enforcement of the Shareholders' Agreement is unconscionable under the circumstances, and thus this Court should not exercise its equitable powers to enforce the contract. Because Kiser's defense raises questions of first impression under North Carolina law, it is necessary to review the history of N.C.G.S. § 55-6-27(b) and the law and authorities on unconscionable contracts in this state. The Court will then examine the four specific reasons Kiser asserts that enforcement of the Shareholders' Agreement is unconscionable.

{50} Stock transfer restrictions in North Carolina are governed by N.C.G.S. § 55-6-27, which provides in pertinent part:

> A restriction on the transfer or registration of transfer of shares is valid and enforceable against the holder or a transferee of the holder if the restriction is authorized by this section, <u>it is not unconscionable under the circumstances,</u> and its existence is noted conspicuously on the front or back of the certificate . . . .

N.C.G.S. § 55-6-27(b) (Supp. 1997) (emphasis added).

{51} The "unconscionable under the circumstances" language in the statute appears to be unique to the North Carolina Business Corporation Act. The language is an addition to the language of Section 2.67 of the Revised Model Business Corporation Act (the "Model Act") from which it was derived.

{52} The North Carolina commentary to this section of the statute provides in pertinent part:

> The Model Act was modified in subsection (b) by inserting the language "it is not unconscionable under the circumstances." This modification addressed a concern that the Model Act's section 6.27 may allow the enforcement of unconscionable restrictions. The drafters noted that the Model Act's language in section 6.27 may not allow judicial discretion in a situation where there was initially a reasonable purpose in imposing a restriction but over time the effect of the restriction had become unreasonable because of a change in circumstances. Judicial discretion would allow a court in such a situation to judge the restriction at the time its validity and enforceability are questioned. The amendment does not represent an attempt to change the prior law in North Carolina with respect to unconscionable agreements, but rather to preserve expressly the equitable power of the courts to deny enforcement of agreements that are unconscionable under the circumstances.

N.C.G.S. § 55-6-27 commentary.

{53} The minutes of the North Carolina Business Corporation Act Drafting Committee for February 12, 1987, reveal that the Drafting Committee wanted to have "restrictions that had as much certainty as possible but nevertheless would allow judicial discretion in the case that a restriction was unfair, harsh, or oppressive." N.C. Business Corporation Act Drafting Committee Meeting Mins. of Feb. 12, 1987, at 1. The same minutes reflect:

> [T]he Model Act language may not allow judicial discretion in a situation where there is initially a reasonable purpose in imposing the restriction, but over time the effect of the restriction becomes unreasonable because of a change in circumstances . . . . Section 6.27 of the Model Act . . . appears to allow the imposition of unconscionable restrictions on the transfer of shares, e.g., an option to purchase agreement could provide for the buy back of shares at an unreasonable low price (e.g., book value and book value ends up being one-tenth of the original book value) and it would be "valid and enforceable" under Subsection 55-6-27(b) because it would be authorized by Subsection 55-6-27(d)(1) and it would be for a reasonable purpose under Subsection 55-6-27(c)(1) . . . . [In] this

> example the restriction would be for a reasonable purpose at the outset but over time its effect would be unreasonable, thereby amounting to an unconscionable restriction.

Id. at 1-2.

{54} Neither the Drafting Committee nor the General Assembly intended for the courts of this state to have to determine in every instance what a reasonable or fair price would be for a shareholder's stock when the shareholder was required to resell the stock to the Company. Rather, the statute gave the courts the discretion to refuse to enforce the restriction, if enforcement at the time and under the circumstances would render the contract "unconscionable" under North Carolina law. Neither the Drafting Committee nor the General Assembly intended to change the law in North Carolina with respect to unconscionable contracts. The Drafting Committee minutes of February 12, 1987, specifically state that "the amendment does not represent an attempt . . . to change existing law in North Carolina with respect to unconscionable agreements but rather to expressly preserve the equitable power of the courts to invalidate unconscionable agreements." Id. at 2; accord N.C.G.S. § 55-6-27 commentary.

{55} The Court thus must look to previous North Carolina decisions to determine the standard for unconscionability. The clearest direction is found in the case of Brenner v. Little Red School House, Ltd., 302 N.C. 207, 274 S.E.2d 206 (1981). In that case, the Court said:

> A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. Hume v. United States, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889); Christian v. Christian, 42 N.Y.2d 63, 365 N.E.2d 849, 396 N.Y.S.2d 817 (1977).

Brenner, 302 N.C. at 213, 274 S.E.2d at 210.

{56} In determining whether a contract is unconscionable, a Court must consider all the facts and circumstances of a particular case. "If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." Id.

{57} The decisions generally indicate that the courts look at both procedural unconscionability and substantive unconscionability. Procedural unconscionability involves the absence of a meaningful choice on the part of one of the parties to the agreement. See Rite Color Chem. Co. v. Velvet Textile Co., 105 N.C. App. 14, 411 S.E.2d 645 (1992), cited in State Farm Mut. Auto. Ins. Co. v. Atlantic Indem. Co., 122 N.C. App. 67, 468 S.E.2d 570 (1996). Procedural unconscionability can be found through fraud, coercion, undue influence, misrepresentation, or inadequate disclosure of information. See King v. King, 14 N.C. App. 454, 458, 442 S.E.2d 154, 157 (1994). Mere disparity between the power of the parties to a contract will not in and of itself support a finding of unconscionability. See Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908, 912 (Del. 1989).

{58} Substantive unconscionability relates to the inequality of the bargain. The inequality of the bargain in the contract must be so manifest as to shock the judgment of a person of common sense and the terms so oppressive that no reasonable person would enter into such a contract on the one hand, and no honest and fair person would accept them on the other. See Atlantic Indem. Co., 122 N.C. App. at 73-74, 468 S.E.2d at 573-74. Similar concepts of unconscionability are found in other jurisdictions. See, e.g., Ryan v. Weiner, 610 A.2d 1377, 1382-83 (Del. Ch. 1992).

{59} Interrelated with both procedural and substantive unconscionability is the concept of change in circumstances alluded to in the Drafting Committee minutes and the commentary to the statute. The Court must also determine if there has been a change in circumstances that renders a once reasonable contract unreasonable at the time of enforcement. These are the standards for unconscionability which must be

applied in reviewing the various grounds asserted by defendant Kiser to support his contention that enforcement of the restriction under the circumstances would be unconscionable.

{60} First, the Court has examined the record for evidence of procedural unconscionability in the formation or implementation of the Shareholders' Agreement. The Court finds that there are no material disputed facts pertinent to this inquiry and that the facts do not establish procedural unconscionability. It is undisputed that Kiser was not forced to enter into the Shareholders' Agreement, but did so freely and voluntarily. As Chief Financial Officer, he had access to all of the pertinent financial information necessary to make an informed business decision. It is also undisputed that he played a significant role in the design of the plan, having met with the lawyers and accountants who helped design the plan. As Chief Financial Officer, he was familiar with the operation of the plan and how it was being implemented and enforced with respect to other shareholders.

{61} As a separate ground for procedural unconscionability, Kiser asserts that he received a promise before entering into the 1986 agreement that the Company would not use termination to force him to sell his stock. The Court has reviewed the affidavit and deposition testimony in detail and finds that there is no material dispute with respect to the conversation upon which Kiser relies to establish procedural unconscionability. The testimony is clearly set forth in Kiser's deposition at page 31 and Otis Crowder's deposition at pages 47-48. The testimony of both men clearly establishes that Otis Crowder told Kiser that the Company would never terminate nonfamily employees in anticipation of a sale of the Company in order to redeem their stock at a price less than the value to be received on sale of the Company. A circumstance involving the sale of the Company did not exist at the time this Court was called upon to determine whether to enforce the restrictions in the Shareholders' Agreement. Accordingly, the Court need not decide whether such an oral promise would be enforceable or considered by the Court in other circumstances.

{62} In summary, the Court finds that there is no evidence of fraud, coercion, undue influence, misrepresentation, or inadequate disclosure sufficient to give rise to a claim of procedural unconscionability in connection with the enforcement of the Shareholders' Agreement.

{63} Second, the Court must consider whether or not there has been a change in circumstances that has caused the restriction to become unconscionable at the time of enforcement even though it may not have been unconscionable at the time the parties entered into the contract. Kiser asserts two such changed circumstances in support of his unconscionability argument. First, he argues that a disparity has arisen between the fair market value and book value of the machinery and equipment. Second, Kiser argues that a change in the timing of tax liability associated with the vesting of shareholders' rights under the agreement is grounds for a finding of unconscionability under the circumstances.

{64} Kiser argues that there has been a change in circumstances rendering enforcement of the Shareholders' Agreement unconscionable because the machinery and equipment had a fair market value substantially in excess of its book value. Specifically, Kiser's expert claims that the fair market value of the Company's machinery and equipment is some $5,000,000 more than the book value. For purposes of this decision, the Court assumes that there is a substantial difference between the fair market value of the machinery and equipment and the book value. That may or may not be a hotly contested issue if the case is ever tried. The problem that the Court has with Kiser's theory is that it requires a valuation different from the valuation bargained for in the agreement. There would be a change in circumstance under every agreement if the shareholder against whom enforcement is sought may change the method of valuation. This agreement was based upon adjusted book value as determined by the Company's outside accountant. The fair market valuation used by Kiser's expert was based upon assessment methods employed for other purposes, for example, fulfilling Department of Transportation bidding requirements. Kiser's theory would require the Company or its accountant to evaluate every component of book value to determine if an adjustment ought to be made based on fair market value. That approach eliminates the use of book value in any agreement because it would invite either party to the agreement to contest the valuation and thus eliminate the use of what has historically been accepted as a simple, inexpensive, and readily recognizable

valuation method. The Court is also persuaded that there is no unconscionability in the use of book value in this case where there is no allegation that the depreciation methods were not based upon generally accepted accounting practices. In this particular case, Kiser was the Chief Financial Officer and had direct responsibility for the depreciation methods selected.

{65} It is also important to note in this context that this is not a situation in which the shareholder is receiving an insignificant or insubstantial return on his investment. Kiser will receive $201,142.50 on a total investment of $47,250. With respect to the 1986 Plan, his profit includes the benefit of an original purchase price at a substantial discount to book value, and with respect to the 1988 stock option, he will receive not only his purchase price back, but the full measure of the book value's appreciation during the period of his ownership.

{66} Kiser also argues that the Shareholders' Agreement is unconscionable because there has been a change in circumstances relating to the timing of tax liability on any profit earned by an employee under the Shareholders' Agreement. It is clear that some of the facts with respect to this issue would be contested at trial. However, for purposes of this motion, the Court has accepted the facts in the light most favorable to defendant Kiser. The Court assumes for purposes of determining this motion that Kiser was informed by Deloitte & Touche and believed in 1986 that he and the other employee purchasers would not owe any tax on any profit on the purchase of their stock until the stock was sold. In 1994, Deloitte & Touche informed the Company that the employee purchasers would owe tax on any appreciation in their stock over the purchase price at the end of the seven-year maturity period called for under the Shareholders' Agreement if the Company took a tax deduction for that amount. In Kiser's case, this meant that he incurred a tax liability for calendar year 1993 for the stock purchased under the 1986 Plan. However, this situation was not discovered until late 1993 and was a topic under discussion at the time of Kiser's termination. Since he was not fully vested under the 1988 stock option plan, the only tax liability he would incur under that plan would be for the difference in the original purchase price he paid and the amount paid to him by the Company under the Shareholders' Agreement when he was terminated.

{67} Two things are important to note with respect to this allegation of changed circumstances. First, the Shareholders' Agreement always provided that the employee, not the Company, would pay the tax on any appreciation in value. The change of circumstances was thus limited to the timing of when the tax was due. In Kiser's case (as opposed to other shareholders still employed), the change in circumstance coincided with his termination and the triggering of his obligation to sell and the Company's obligation to purchase his shares. Had Kiser complied with the Shareholders' Agreement, he would have had "real" not "phantom" income and some cash to pay his taxes. The Court concludes that in Kiser's individual situation, the change in timing of tax liability was not a change in circumstances rendering the Shareholders' Agreement unconscionable.

{68} In summary, the Court concludes that there has not been a change in circumstances which would render the Shareholders' Agreement unconscionable at the time of Kiser's termination of employment.

{69} Finally, Kiser argues that there is substantive unconscionability in enforcement of the Shareholders' Agreement based upon a number of issues relating to his employment and the termination thereof. Kiser asserts that Otis Crowder specifically timed the termination of Kiser's employment to occur prior to the seven-year vesting dates for his 1988 shares in a bad-faith effort to avoid having to pay him the full adjusted book value of those shares, a value that he "earned" through his years of "undercompensated" employment with the Company.

{70} It is undisputed that the agreement contained a requirement that an employee remain in the employment of the Company for a full seven years in terms of earning the full adjusted book value of the shares. If the employee was terminated prior to completing seven full years, the employee would receive the appreciation in book value over and above the original stated book value in the agreement, but would not receive the built-in discount to book value. Thus, a substantial portion of the benefit under the Shareholders' Agreement in both the 1986 and 1988 Plans was "at risk." In fact, the Company's attorney,

H. Morrison Johnson, wrote to Kiser on April 1, 1986, specifically stating:

> In regard to the question of whether the stock to be received upon execution of the option is subject to a substantial risk of forfeiture, I agree that it is. Therefore, when an employee exercises the option, he will not be required to report income at date of exercise. He may elect to have income by filing the Section 83(b) election. However, the employee who does not elect to be taxed at date of exercise will have taxable income (assuming there has not been a reduction in value) upon expiration of 7 years from issuance.

{71} Kiser was terminated in January of 1995. His vesting dates under the 1988 Plan would have occurred in August and September of 1995. His vesting dates under the 1986 Plan had already passed, and he was fully matured under that plan. Kiser asserts that Crowder timed the termination of his employment with the specific intention of reducing the repurchase price for his stock by some $210,135. He asserts that the timing of his termination was intentional and impacted the repurchase price in two ways. First, he asserts that the termination was timed to occur before the March 31, 1995, fiscal year so that the valuation for his stock would be determined under the plan in accordance with the March 31, 1994, year end instead of book value for March 31, 1995. It turned out that the difference in book value between the two years was $4.51 per share. The second impact was the loss of the discount to book value because he was terminated prior to maturity of his seven-year vesting period.

{72} Kiser further argues that enforcement of the agreement would be inequitable and unconscionable because he was terminated without warning and because he was going to argue to the other shareholders at the shareholders' meeting scheduled to take place shortly after his termination that the Crowders were being greedy and that they should pay the tax liability for the shareholders who had phantom income under the 1986 and 1988 Plans.

{73} Kiser's arguments are without merit. Vesting periods in stock option agreements are not unusual or unconscionable per se, and the tax code recognizes the "at risk" nature of those agreements as indicated in Johnson's letter quoted above. It is also not unusual for evaluation to be made on the basis of a prior year's financial statement. The reasons for doing so are clear. For small, closely held companies, the cost of having a mid-year audit solely for the purpose of determining stock value would be prohibitive. Use of the prior year's book value requires only a mathematical calculation and not substantial auditing fees. Accordingly, in every case of a mid-term termination, the possibility exists that the timing of the termination was motivated by a desire to reduce the stock purchase price. The Court need not decide on this record if a termination motivated <u>solely</u> by a desire to reduce the purchase price of stock or cut off vesting is unconscionable because the record in this case establishes a clear, justifiable business purpose for Kiser's termination and the timing of that termination.

{74} In reviewing these types of cases, the Court should first determine if the terminated employee has made out a <u>prima facie</u> case that the employer's motivation in terminating the employee was to benefit financially by reducing its obligation under a repurchase formula. If a <u>prima facie</u> case is established, the burden should shift to the employer to show a legitimate business reason for the termination and the timing of the termination. If the employer shows a legitimate reason for the termination and the timing, the burden then shifts back to the employee to prove that that reason was a pretext.

{75} In this case, the economic benefit to the Company from Kiser's termination prior to completion of the seven-year vesting requirement is clear. It is less clear that Company management knew in January of 1995 that book value for the year ending March 31, 1995, would exceed book value for the year ending March 31, 1994. In fact, it is undisputed that the Company was going through difficult economic times in January of 1995 and was having management meetings to address some of its problems. It is significant that there is no indication of a pattern or practice by the Company of timing terminations to benefit the Company under the various stock plans. Certainly, as Chief Financial Officer, a Director, and a member of the Executive Committee of the Company, Kiser would have been aware of such prior activity and introduced evidence of it. There is no other evidence that points to reduction of the repurchase price as a

motivating factor, much less the sole motivating factor behind Kiser's termination. If Kiser has established a prima facie case, it is a weak one. However, even if Kiser has made out a prima facie case, the Court is convinced that the Company has carried its burden of establishing a legitimate business purpose for the termination. It is undisputed that an adversarial relationship existed between Kiser and Otis Crowder and other members of the management of the Company and that Crowder believed that the adversarial relationship was disruptive and detrimental to the management of the Company. It is also clear that the Company was experiencing economic difficulty and difficulties arising from the transition in management from the older generation of Crowders to the younger Crowder managers.

{76} Kiser's own testimony in this case establishes a legitimate business justification for his termination. Kiser has testified that he was never able to truly figure out how to get along with Otis Crowder and that towards the end of his employment at the Company, he tried to avoid Otis Crowder. (Kiser Dep. at 143-44.) During 1994, many group manager meetings were spent in arguments between Eugene Kiser and Otis Crowder. (Kiser Dep. at 125.) As a result, Kiser was aware that during 1994 his relationship with Otis Crowder was deteriorating. (Kiser Dep. at 130.) His relationship with at least one other key manager was also strained. (Kiser Dep. at 130-31.) Eugene Kiser and Otis Crowder were not communicating well, and Kiser talked about that with other employees. (Kiser Dep. at 138.) In addition, Kiser shared his view with other employees that Otis Crowder was not doing a good job as President, was incompetent, and could not make decisions. (Kiser Dep. at 128-29.) Kiser and Crowder had disagreements over basic operating philosophy. (Kiser Dep. at 123-25; Kiser Aff. ¶ 8.) Thus, Kiser's own evidence establishes that his relationship with Otis Crowder at the end of 1994 was at best incompatible and at worst openly hostile. The deposition testimony of Wilson, Francis, Pietkiewicz, and Tucker is uncontroverted and clearly establishes the poor relationship between Kiser and Otis Crowder.

{77} On top of this poor working relationship, two additional undisputed disagreements arose at the end of 1994. In the face of growing economic problems, the Company brought in an outside management consultant in the fall of 1994 to help evaluate the Company's financial and operation problems. By his own admission, Kiser vehemently disagreed with some of the suggestions of the outside consultant. (Kiser Aff. ¶ 11.)

{78} It is also clear that Otis Crowder believed that Kiser had breached explicit instructions to maintain strict confidentiality with respect to the items that were discussed at the management retreat. Kiser admits violating the instruction, but believes there was a business justification for doing so. (Kiser Dep. at 37.)

{79} At the same time the Company was trying to deal with the financial and operational issues and economic difficulties, it was also facing a decision about what to do with respect to the tax liability of the option holders. Management made the decision to take the tax deduction and report the income for the option holders. In order to address the problem of phantom income to the option holders, the Company agreed to loan the option holders the money to pay their taxes. Kiser again vigorously disagreed with the management decision and voiced his opinion that the decision was grossly unfair and made to financially benefit the majority shareholders. He had voiced those feelings to Otis Crowder (Kiser Aff. ¶ 14) and would have repeated those same sentiments at a shareholders' meeting which was scheduled to take place shortly after his termination. Kiser acknowledges that his views with respect to the tax liability had created an additional strain in his relationship with Otis Crowder. (Kiser Dep. at 123.)

{80} The Company has thus come forward with evidence to establish a legitimate business reason for terminating Kiser's employment and for the timing of that decision. Kiser has not produced any evidence which would establish in any way that that legitimate business reason was merely a pretext to repurchase his stock at a lower value. It does not make any difference whether Kiser's business judgment was better than Otis Crowder's, whether Kiser was right about the way to handle the tax liability on the stock options, or whether the outside consultant's advice was good or bad. Where a key management employee openly disagrees with basic business decisions being made by the management and owners of the company and voices an opinion to fellow employees and others outside the company that the president is incompetent and not doing his job, termination of employment should come as no great surprise. The

owners of the Company had a reasonable business interest in having a cohesive management team that agreed upon the direction the business should take and whose members respected each other and worked well together. There was clear uncontroverted evidence that Kiser, who held a key management position, did not fit on that team. The Company has demonstrated a business purpose for Kiser's termination, and Kiser has not shown that that reason was a pretext.

{81} Finally, Kiser has made the argument that the result of enforcement of the Shareholders' Agreement would be substantively unconscionable because (a) he would be undercompensated if he did not get the additional payoff under the 1988 stock option plan, and/or (b) the fair market value of his stock is significantly more than the book value, however calculated. There are no material disputed facts preventing summary judgment because the Court will assume for purposes of this motion that both facts are true. Kiser's argument with respect to both suffers from the same infirmity. The contract or bargain which the parties (knowledgeable business people) struck in 1988 was reasonable at the time and was entered into voluntarily by each side with full knowledge of its terms and conditions. Kiser, as an accountant and knowledgeable businessman, was familiar with the risk inherent in the vesting period contained in the 1988 Plan. He and two other employees initiated the discussions with the company concerning additional incentives for their remaining with the Company, and he worked with the attorneys and accountants in designing the plan. As an accountant, he understood the tax advantages of the potential benefit being "at risk," and the Company's attorney had confirmed that to him in writing. Kiser would have the Court rewrite the contract to eliminate the risk. The Court does not believe the agreement, bargained for by knowledgeable businessmen, was unconscionable at the time it was signed. Nor was it unconscionable at the time of enforcement. Likewise, Kiser knew at the time the 1986 and 1988 agreements were entered into that the fair market value of the Company was substantially greater than the book value. The topic was discussed openly, and the Crowders refused to consider fair market value rather than the book value as a valuation method under the agreement. To invalidate the agreement on the grounds that Kiser is now being required to sell his stock for far less than its market value would also require that the contract be rewritten. The Court should not rewrite the contract to include a provision or method of valuation that was specifically rejected at the time the agreement was being drafted.

{82} The Court concludes as a matter of law that the 1991 Shareholders' Agreement is valid and enforceable, that the restrictions contained therein are reasonable, and that enforcement of those restrictions is not unconscionable under the circumstances. There are no material disputed facts which need resolution in connection with the Court's determination of either the motion for summary judgment or its exercise of discretion in connection with the requests of both parties for equitable relief. The Court, exercising its discretion and inherent equitable powers, will order specific performance of the 1991 Shareholders' Agreement by both parties.

### ORDER OF THE COURT

{83} Based upon the foregoing findings of fact and conclusions of law, it is hereby ORDERED, ADJUDGED, and DECREED that plaintiff Crowder Construction Company's Motion for Summary Judgment is granted and that plaintiff is entitled to specific performance of the 1991 Shareholders' Agreement. Defendant Kiser is ordered to resell his stock to Crowder Construction Company at the contract specified price based upon adjusted book value as certified by the Company's accountants. Plaintiff shall comply with all requirements of the agreement for payment of the stock at the contract specified price and terms. The parties to this action shall bear their own Costs.


This 10th day of March, 1998.